ASSOCIATED TRADERS, INC.
v.
UNITED STATES.
No. 359–55.

United States Court of Claims.
Jan. 14, 1959.

Solomon Dimond, Washington, D. C., for plaintiff.

George L. Ware, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

JONES, Chief Judge.

Plaintiff seeks reformation of a supply contract on the ground of alleged misrepresentation on the part of a representative of the defendant. In the alternative, it seeks reimbursement for asserted excess repurchase costs which the defendant paid for that portion of the contract materials which plaintiff failed to deliver according to the terms of its supply contract with the defendant.

The essential facts are clearly set out in our findings and will be summarized here.

According to the contract, plaintiff was to furnish 5,920 gallons of liquid "Adhesive, Label, Water Resistant" conforming to designated specifications, to be delivered in equal amounts, in five-gallon cans, to the Fort Worth Quartermaster Depot, Fort Worth, Texas, and Sharpe General Depot, Lathrop, California. The price finally agreed upon was $1.67 per gallon, f. o. b. the respective destinations.

The request for bids stipulated that it was to be a negotiated contract.

The proposals were sent to 55 prospective bidders and bids were received on various sub-items from 22 bidders. The proposal form required the bidder to state whether it was a regular dealer or manufacturer of adhesive supplies, and stipulated that if the bidder proposed to use Government surplus a complete description of the product, the quantity to be used, and date and source of acquisition should be set forth in the proposal.

On one of the items involved in this suit there were nine bidders and on another item there were six bidders.

Plaintiff stated that it was a regular dealer in the supplies bid upon and if awarded the contract it would deliver supplies which it had acquired from one of the Quartermaster General depots in Ogden, Utah, in 1948; that it held the material in 53-gallon drums, but that de-

livery would be made in new five-gallon cans acquired from a can manufacturing company.

Plaintiff offered to furnish the supplies at $1.97 per gallon, f. o. b. destination. The other bidders on the particular items were somewhat higher, ranging from $2.11 up to $3.56 per gallon.

Plaintiff was the only bidder which was not a manufacturer of the adhesive, and the only bidder who offered government surplus material. Plaintiff had purchased this material at 15¢ per gallon in 1948, but there is no evidence as to the storage or other costs incurred by plaintiff thereafter in connection with the adhesive.

The specifications set up detailed standards for the material. These are disclosed in finding 6. Plaintiff supplied a one-quart sample of the adhesive it intended to furnish under its bid. This sample met the standards set out in the specifications.

About February 15, 1951, after being advised that plaintiff's sample met the specifications, a Mr. Davis, the assigned purchasing agent of the procurement agency in New York, telephoned to plaintiff at Denver, Colorado, advising plaintiff's vice president and secretary-treasurer that its sample of adhesive had passed the required test. He requested that plaintiff's bid on the items which it had offered to furnish be reduced to $1.67 per gallon, giving as his reasons for the request that the adhesive material was purchased by plaintiff as "war surplus" at a greatly reduced price; that it was probably not up to the standard of that being manufactured at the time the bid was submitted, and that the material had possibly deteriorated due to the long storage after the time of the original manufacture.

Plaintiff's officers at first objected to Mr. Davis' statement and replied that the material was in good condition and would be in compliance with the sample submitted. At the close of the conversation, however, the bidder's representative stated that the matter would be taken up with the officers of the plaintiff company and that a telegram would be sent as to whether or not plaintiff would offer the material at a lower price. On February 15, 1951, the plaintiff's vice president, Mr. Ben Barnes, with the approval of the officers of the plaintiff company, sent a telegram advising that it would furnish the supplies covered by its bid at $1.67 per gallon.

The award was made and the contract entered into for the plaintiff to furnish 5,920 gallons of adhesive in the manner and at the places heretofore mentioned.

On April 23, 1951, the General Testing Laboratory Division of the Quartermaster Corps reported that the composite sample taken from containers in plaintiff's warehouse met the required specifications.

Plaintiff delivered 5,145 gallons of contract material and defaulted on the remaining 775 gallons. Plaintiff first requested permission to ship 765 gallons of material from its stores in San Francisco, but a few days later advised the defendant that it could not furnish the San Francisco adhesive because it had become contaminated due to damage to the drum containers.

On June 8, 1951, defendant's contracting officer asked plaintiff whether it would furnish the undelivered 775 gallons of contract material, at the same time advising that if it did not do so it would become necessary for defendant to purchase the undelivered portion elsewhere and charge the excess cost against plaintiff's account. By letter dated July 10, 1951, defendant warned plaintiff that the contract would be partially terminated for default unless plaintiff replied by July 20. Plaintiff made no reply. Thereafter, by letter dated September 13, 1951, defendant's contracting officer advised plaintiff by letter that its right to deliver the 775 gallons was cancelled and that it would purchase the 775 gallons of adhesive in the open market and any excess cost would be charged to the plaintiff's account. On September 14, 1951, the defendant's contracting officer mailed copies of a request for quotation on the

775 gallons to each of the other bidders who had submitted offers when the original bids had been requested.

The low bidder was the Union Paste Company of Hyde Park, Massachusetts, which bid $2.70 per gallon on 10 gallons, f. o. b. Fort Worth Quartermaster Depot, and $2.85 per gallon on 765 gallons, f. o. b. Sharpe General Depot. By negotiation, Mr. Davis induced the company to reduce the bid for the 765 gallons to $2.30 per gallon, or a total reduction of $420.75.

The Union Paste Company delivered the 775 gallons of adhesive at the price of $2.70 per gallon for 10 gallons, and $2.30 per gallon for 765 gallons. This was a fair and reasonable price for the contract material on October 16, 1951. If plaintiff had performed its contract to deliver the 775 gallons of material, the cost to defendant would have been $492.-25 less than was paid to the Union Paste Company. The defendant collected from plaintiff the $492.25.

Plaintiff protested and appealed to the Armed Services Board of Contract Appeals. Pertinent parts of the decision are set out in finding 18. The board held that the particular adhesive that plaintiff contracted to furnish was purchased by it at a very low price as surplus; that no other similar material was available in that area at that price; that for these reasons the repurchase was not made under sufficiently similar specifications to warrant the contracting officer's charging plaintiff with the excess cost of the 775 gallons of material which was actually purchased in lieu of what the plaintiff failed to furnish; and that there were other avenues by which the Government could approach the problem of recovering its damages arising from the default in delivery. Therefore, the board found that the means selected by the contracting officer were not appropriate in this instance. Seven members of the board concurred in the opinion; three concurred in the result; and four dissented.

The Comptroller General refused to follow the decision of the board and upheld the action of the contracting officer in assessing and collecting the damages resulting from plaintiff's failure to deliver the 775 gallons of liquid adhesive.

Plaintiff first asserts that the Government made a misrepresentation which would warrant a reformation of the contract. Second, that the decision of the Armed Services Board of Contract Appeals holding that the reprocurement was not made under sufficiently similar specifications to warrant the contracting officer's basing the amount of excess costs on such bids was final and binding upon the defendant.

Taking up the first of these contentions, we find nothing in the record even approaching such a misrepresentation as would justify a reformation of the contract. Plaintiff alleges that at the time Mr. Davis sought a reduction in the price from $1.97 to $1.67 per gallon Mr. Davis knew that the sample had met the tests provided in the specifications and that he did not inform the plaintiff that the sample had met the tests. This is the primary basis of its charge of misrepresentation. Mr. Davis' testimony was that "We notified, or I believe I telephoned Associated Traders, telling them the sample had passed." Some years had passed and, of course, memories were not as fresh after the passage of years as they would have been otherwise.

At any rate, the plaintiff knew, or certainly should have known, that the contract terms would require that his product meet the specifications. Otherwise the sale could not be consummated. This fact was disclosed in the bids and in the contract that was ultimately signed. Even if there had been no disclosure we think that in all the circumstances revealed here it would be a very thin basis for a court's undertaking to reform a contract on the ground that there had been misrepresentation. We find no adequate basis for holding that there was any sufficient misrepresentation or any adequate ground for reforming the contract.

To be actionable, the misrepresentation must be relied upon and must induce the recipient to do something to his detri-

ment which he would not otherwise have done. In re Wilson-Nobles-Barr Co., D. C., 256 F. 966; 5 Williston on Contracts (Rev. ed. 1937) § 1515.

To justify a reformation of the contract the evidence must be of a very clear and convincing character. Philippine Sugar Estates Development Co. v. Government of Philippine Islands, 247 U.S. 385, 38 S.Ct. 513, 62 L.Ed. 1177; James Stewart & Co., Inc. v. United States, 94 Ct.Cl. 95. We find the evidence of misrepresentation insufficient to meet the tests laid down by the authorities.

■ The second count which plaintiff presents is the more serious one. It involves the binding effect of the decision of the Board of Contract Appeals on the propriety of the repurchase by the defendant under the default clause of the contract. It seems to us, however, that we have here a question of the interpretation of the contract which involved a question of law and therefore not binding (41 U.S.C.A. §§ 321–322). There is no real dispute as to the essential facts in the case. Under the contract the parties had agreed that in the event of termination for default the Government could procure supplies "similar to those terminated and the Contractor should be liable * * * for any excess costs for such similar supplies * * *." It is the meaning to be ascribed to the word "similar" as used in this clause which is in issue here.

The gravamen of plaintiff's complaint is not that there was no default but that in repurchasing, a different quality of product was secured. As a matter of fact, however, plaintiff's adhesive and that repurchased met the requirements of the same specifications. There is not in the record any evidence of the age of the repurchased material, nor as to the time within which any deterioration might occur when the commodity was locked in airtight drums. The plaintiff reduced the quantity of adhesive delivered not on account of the nature of the material but because of contamination due to the damaged containers. Evidently this had occurred in handling or while in storage.

Whether this contamination was the result of exposure to the air or to rust or dust or other materials is not quite clear from the evidence.

We do not understand that the word "similar" must in all cases be treated as meaning "identical". A composite of the definitions of the word "similar" as given in Black's and Bouvier's law dictionaries is to the effect that it means "nearly corresponding; resembling in many respects; somewhat like; having a general likeness or sameness in all essential particulars." Rarely has it been held to mean identical, other than when applied to criminal cases. The definitions in the standard dictionaries are to the same general effect.

The only requirement prescribed in the invitation to bid and in the contract is that the adhesive should conform to the specifications set out. The surplus material which was delivered and the material repurchased both met these specifications.

The plaintiff concededly did not comply with its contract. It did not furnish the quantity of adhesive that it had agreed to furnish. The terms of the contract provided that in the event of failure the commodity might be purchased elsewhere and the excess cost charged to plaintiff's account. Plaintiff was advised on June 8, 1951, that it would be necessary for it to deliver the 775 gallons of contract material and that if it did not, it would be necessary for defendant to purchase the commodity against plaintiff's account. By letter dated July 10, 1951, defendant warned plaintiff that the contract would be partially terminated for default by July 20, unless delivery was made. Plaintiff made no reply to any of these communications. By letter dated September 13, 1951, defendant's contracting officer advised plaintiff that the unperformed part of its contract was being terminated. The plaintiff had the period from June 8, 1951, to September 13, 1951, to undertake to procure the commodity elsewhere. It made no move to do so. None of the other bidders had surplus material. The defendant made every rea-

sonable effort to secure the additional commodity at the lowest obtainable price. It induced the company that furnished the additional material to reduce its price.

We find no sufficient reasonable basis on which to sustain either of plaintiff's contentions.

The petition will be dismissed.

It is so ordered.

EDGERTON, Circuit Judge, sitting by designation, and LARAMORE, MADDEN and WHITAKER, Judges, concur