**C. J. LANGENFELDER & SON, INC.**

**v.**

**The UNITED STATES.**

**No. 291-63.**

United States Court of Claims.
Feb. 19, 1965.
Rehearing Denied June 11, 1965.

602

J. Roy Thompson, Jr., Washington, D. C., for plaintiff. Howard H. Conaway, Baltimore, Md., Thompson, McGrail & O'Donnell, Washington, D. C., and Frank, Bernstein, Gutberlet & Conaway, Baltimore, Md., of counsel.

John R. Franklin, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, REED, Justice (Ret.), sitting by designation, DURFEE, DAVIS, and COLLINS, Judges.

DAVIS, Judge.

In December 1958, plaintiff entered into a contract with the Federal Aviation Agency to do grading, drainage, and paving work at Dulles (then called Washington) International Airport. Part of its task under the contract was the installation of approximately 26,000 feet of subsurface pipeline. The specifications outlined the requirements for normal trench excavation and backfill operations in connection with the pipeline installation and provided for compensation at the contract unit price, which was $3.93 per cubic yard. There were also specific provisions dealing with unstable soil encountered in the excavation. Since such soil was unsuitable for use as backfill, it was to be removed to the depth determined by the defendant and replaced with approved backfill. The specifications included special provisions dealing with compensation for the removal of unstable soil ($6.00 per cubic yard), and the present controversy revolves around their meaning.[1]

---

1. The pertinent portions of the specifications are:

"EXCAVATION [702-3.2]: The contractor shall excavate all materials en-

In the course of trench excavation, the contractor did meet unstable soil and was authorized by the Aviation Agency to remove and replace it. After carrying out these directions, plaintiff filed a request for additional compensation of $6.00 per cubic yard for all this work. In August 1961, the contracting officer determined that plaintiff was entitled to the additional payment only for the removal and replacement of unstable soil below the excavation depths shown on the contract drawings; unstable materials found within the indicated depths were to be paid for at the normal rate of $3.93 per cubic yard. Following the procedures then in effect, the plaintiff appealed this decision to the Administrator of the Federal Aviation Agency; after a hearing before a member of the Agency's Contract Appeals Panel, the Administrator overruled the contracting officer, on June 20, 1962, and accepted plaintiff's position. Shortly thereafter, plaintiff submitted a documented claim to the contracting officer for $160,964, based on the Administrator's direction to compensate the contractor "in the light of this decision."

The contracting officer took no action. The parties held a meeting in May 1963, at which the plaintiff was informed that its claim had not been determined for over nine months because the contracting officer was uncertain as to the proper interpretation of the Administrator's decision. At that meeting, the General Counsel of the Federal Aviation Agency requested an attorney in his office to prepare a memorandum discussing the Administrator's decision. The memorandum was subsequently filed, on June 28, 1963, "on behalf of the contracting officer", with the Contract Appeals Panel of the Agency as a request for a "supplemental decision" by the Administrator. Despite its euphemistic characterization, the true gist of this application was that the Administrator's original decision was wrong. Plaintiff squarely opposed consideration of this request for a reopening, but on September 30, 1963, the Administrator granted it, and referred the case back to the Contract Appeals Panel for a full rehearing.[2] In October 1963, plaintiff filed its petition in this court, contending that the Administrator's decision of June 1962 was final and conclusive, and that the Agency's rules in effect at the time of that ruling precluded the grant of a rehearing over one year later at defendant's request. The contractor also asserted that the contracting officer's refusal to effectuate the Administrator's original decision was arbitrary and capricious, and sought re-

countered to the depth required. * * *

"Excavated material not required or acceptable for backfill shall be disposed of by the contractor as directed by the government. Excavation shall not be carried below the required depth. * * *

"Unstable soil shall be removed for the full width of the trench and replaced with sand or with approved granular material. The government shall determine the depth of removal of unstable soil and the amount of backfill necessary. The backfill shall be thoroughly compacted and shaped to form the bed for the pipe.

"The cost of removing unsuitable soil shall be paid for at the unit price for Unclassified Excavation for Structures under 752–5.1 [$6.00 per cubic yard]. This will include all required replacement with approved materials as specified * * *.

"Pipe trenches shall be excavated to the depths required for installation of the pipes at the invert elevations shown on the plan.

"Any change in depth in excess of six (6) inches will be paid for under Item 752–5.1, Unclassified Excavation for Structures.

* * * * *

"BASIS OF PAYMENT [702–5.1]: The footage of pipe * * * shall be paid for at the contract unit price [$3.93 per cubic yard] * * * which price and payment shall constitute full compensation for furnishing, hauling, and installing the pipes; for excavation; for bedding; backfill and compaction * * *."

2. From the Government's application to the Administrator and his second decision it is clear that he wholly reopened the case so as to allow the Government to show that the contractor was entitled to nothing more than the award originally made by the contracting officer.

imbursement of the $160,964 previously claimed from the Agency. The defendant has moved to dismiss the petition on the ground that plaintiff failed to exhaust its administrative remedies; in the alternative, defendant requests the court to suspend proceedings to permit the formulation of an adequate administrative record by the Agency. Plaintiff has moved for a summary judgment of liability.

 A. *Defendant's motion to dismiss*. Disposition of the defendant's motion to dismiss turns on the Federal Aviation Agency's authority to reconsider its initial decision favoring the contractor. If the Agency had power to order a rehearing of this case as it did, plaintiff has failed to exhaust its administrative remedies. Under the rules at the time of the Administrator's original decision,[3] motions for rehearing could be based only on new evidence and were required to be filed within a reasonable time after receipt of the Administrator's decision. 41 C.F.R. § 2–60.20 (1960).[4] Plaintiff offers a number of arguments to prove that, under this provision, the Agency had no power to grant the contracting officer's motion

for a rehearing, but we can stop with the regulation's requirement that such motions be made within a reasonable time. Cf. Dayley v. United States, Ct. Cl., No. 268–63, decided Jan. 22, 1965. The request for a "supplemental decision"—which was nothing but an application for reconsideration of the initial holding and was treated as such by the Administrator—was presented over a year after the decision of June 20, 1962. This was far too belated. In the circumstances here, a year was much more than a "reasonable period" to defer the finality of the Administrator's ruling. A number of statutes, as well as administrative regulations, limit the time within which a party may petition an administrative agency for rehearing or reconsideration to thirty days following the final decision. See, e. g.; Communications Act Amendments, § 15, 66 Stat. 711, 720, 47 U.S.C. § 405; Natural Gas Act, § 19, 52 Stat. 821, 831, 15 U.S.C. § 717r(a). The revised Federal Aviation Agency regulation on motions to reconsider includes such a provision, but permits an extension beyond the thirty-day limit if good cause can be shown. 41 C.F.R. § 2–60.210–4 (1963).

---

3. When plaintiff's appeal was considered in 1962, the Aviation Agency's appellate procedure differed considerably from that of the Armed Services Board of Contract Appeals. See 41 C.F.R. § 2–60 (1960). At the hearing before the member of the Contract Appeals Panel, only the contractor's case was to be presented. Evidence on behalf of the Government was not to be adduced (41 C.F.R. § 2–60.12), but prior to the hearing the chairman of the Contract Appeals Panel was to "supply to [the contractor] copies of such relevant factual material in the possession of the Government as the Chairman · may deem to be desirable in order to assist the contractor to develop his case." 41 C.F.R. § 2–60.8. The regulations did not prescribe the mode of presenting the Government's case to the Contract Appeals Panel or to the Administrator (if there was any such presentation at all), nor did they indicate whether the contractor would have any access to the Government's arguments or

evidence, other than under the provision just quoted.

4. 41 C.F.R. § 2–60.20 (1960), which became effective on June 9, 1960, provided: "*Motions for rehearing*. In most instances, the decision of the Administrator as to questions of fact, by the terms of the contract involved, are final and conclusive and binding on the parties thereto. Motions for rehearing or reconsideration will not be considered unless based upon evidence not previously available to the contractor or considered by the member to whom the appeal was assigned, in making his recommendation to the Administrator. Such motions must be filed within a reasonable period of time from the date of receipt of the Administrator's decision and shall set forth specifically the grounds relied upon."

Since it was not superseded until June 20, 1963, this regulation covers the events in controversy. The superseding regulation revises and amplifies its predecessor. See 41 C.F.R. § 2–60.210–4 (1963).

The Federal Maritime Board Rules of Practice and Procedure, 46 C.F.R. § 201.-264 (1953), contain a similar time-extension clause. These provisions help to delimit what constitutes a reasonable time within which to ask for rehearing.[5] Thirty, or perhaps sixty, days is the order of magnitude—unless a special need for a longer period is shown. There is no real suggestion that the rehearing in this case could not have been sought much earlier; the essence of the application was simply that the original decision was incorrect. It is particularly difficult to prove good cause for delay much beyond thirty days where the controversy, as here, deals only with past events which have been definitively ascertained at the original hearing and where the basic issue is one of law. The defendant has not even attempted to show that more than a reasonably short period was required to gather information sufficient to present the legal point embodied in the motion for rehearing. As the case comes to us, there is no adequate excuse for the long delay. Accordingly, we must hold that the regulations did not permit the Agency to make the motion after so much time had elapsed, and they did not give the Administrator authority to grant it. The Agency could not delay payment of a claim approved in substance by its Administrator and then perform a complete turnabout one year later by granting the Government's untimely motion for reconsideration, thus reopening the settled question of liability in the guise of an impermissible rehearing.

█ What remains is a refusal by the contracting officer to take action on a claim filed by the plaintiff on the basis of a final determination by the Administrator in its favor. We have held that when the contracting officer unreasonably delays action on a contractor's claim, or refuses entirely to take action, the exhaustion requirement will be excused and the contractor may bring suit directly in this court. Oliver-Finnie Co. v. United States, 279 F.2d 498, 503, 150 Ct.Cl. 189, 196–197 (1960); Cape Ann Granite Co. v. United States, 100 Ct.Cl. 53, 71 (1943), cert. denied, 321 U.S. 790, 64 S.Ct. 785, 88 L.Ed. 1080 (1944); James McHugh Sons, Inc. v. United States, 99 Ct.Cl. 414, 431 (1943). Although those decisions involved claims on which no contract appeals board (or the head of a department) had acted, their reasoning is fully applicable here. In any event, a petition by plaintiff to the Administrator expressly requesting that he direct the contracting officer to make a determination under the decision of June 1962 would surely have been futile, since the Administrator himself had ordered that the entire matter be reconsidered. This was tantamount to a ruling that the contracting officer need not follow the earlier decision. Obviously, no relief would come through a further effort to have the head of the Agency compel his subordinate to abide by that holding. The contractor had, in substance, already exhausted his appeal. If the case be viewed more formalistically, then it falls, we think, within the rule recognized by the Supreme Court that a failure to exhaust administrative remedies will be excused where such procedures are unavailable or inadequate. United States v. Joseph A. Holpuch Co., 328 U.S. 234, 239–240, 66 S.Ct. 1000, 90 L.Ed. 1192 (1946).

Plaintiff cannot be faulted for failing to exhaust any administrative remedies under the contract. The suit is properly in this court, and the defendant's motion to dismiss must be denied.

B. *Defendant's motion for suspension of proceedings.* In the alternative, the Government requests the court to suspend

---

5. Although an administrative agency may be permitted to reopen or modify a decision on its own motion in defined circumstances, e. g., Natural Gas Act, 72 Stat. 947, 15 U.S.C. § 717r(a), the Federal Aviation Agency regulation in effect at the time this case was heard and decided (see note 4, supra) did not authorize such action, and the Agency did not purport to grant the rehearing on that basis.

proceedings so that an administrative record capable of review may be formulated by the Federal Aviation Agency. The Agency kept no record of the hearing before the Contract Appeals Panel which was one basis of the Administrator's final decision in June 1962. For that reason, the defendant contends that this case illustrates the category contemplated by the Supreme Court when it said, "[I]f the administrative record is defective or inadequate, \* \* \* we see no reason why the court could not stay its own proceedings pending some further action before the agency involved." United States v. Carlo Bianchi & Co., 373 U.S. 709, 717–718, 83 S.Ct. 1409, 1415, 10 L.Ed.2d 652 (1963). This was the second of the two methods suggested in Bianchi for avoiding *de novo* trials by this court when the administrative record is inadequate. The first was that "there would undoubtedly be situations in which [the Court of Claims] would be warranted, on the basis of the administrative record, in granting [summary] judgment for the contractor without the need for further administrative action." 373 U.S. at 717, 83 S.Ct. at 1415. That is the situation we have here.

█ Although we do not have a full record of the proceedings on liability within the Federal Aviation Agency, the plaintiff has submitted (with the concurrence of the defendant, see Defendant's Supplemental Memorandum, p. 5) a comprehensive set of exhibits containing the basic written materials considered by the Administrator in reaching his original decision, as well as the arguments which persuaded him to reopen that ruling.[6] These papers make up a large part of the administrative record. The main missing item is a transcript of

the hearing before the Contract Appeals Panel (no transcript was made). If such a report were necessary to determine the plaintiff's motion for summary judgment, we should not be able to render judgment at this time. But, as will appear later in this opinion, we can dispose of the case on the materials now before us; the transcript of the hearing is superfluous to the resolution of the only issues still in dispute. Defective though the administrative record before us may be, it is sufficient for all of the arguments on the merits which have been made or suggested in this court. The use of this partial administrative record as the basis for our decision is consonant with the underlying rationale of Bianchi to avoid "needless duplication of evidentiary hearings and a heavy additional burden in the time and expense required to bring litigation to an end." 373 U.S. at 717, 83 S.Ct. at 1415. To refer the case back to the Aviation Agency at this juncture—when we have all the information necessary to render a proper judgment—would indeed result in useless delay and "needless duplication". We therefore deny the defendant's alternative request to suspend our proceedings so that a full and formal administrative record on liability may be established.

C. *Plaintiff's motion for summary judgment on liability.* In support of its motion for summary judgment on liability, plaintiff contends that (1) the June 1962 decision of the Administrator (in favor of the contractor) is conclusive and cannot be reviewed at all by this court; (2) if that decision can be reviewed, the court will find no disputed issues of law which we may examine *de novo*, but only questions of fact (which are undisputed or must be answered in the plaintiff's

6. These exhibits include the contract between the parties, the relevant extracts from the specifications, the contractor's original claim for additional compensation, the opinion of the contracting officer denying that claim in part, the notice of appeal from that decision and the supporting brief submitted by the contractor, the opinion of the Administrator overruling the contract officer, the

contractor's claim for payment in accordance with the Administrator's decision, the request for a supplemental decision made by the Office of the General Counsel of the Federal Aviation Agency, the extensive memorandum and exhibits tendered in support of that request, and the decision of the Administrator granting a rehearing.

favor on the basis of the substantial evidence test); (3) in any event, the plaintiff's position on the legal questions is correct and requires judgment when applied to the agreed facts. We reject the first two of these arguments, but we agree with the last.

■ 1. Plaintiff first asserts broadly that a final decision by the head of a department for the contractor is conclusive and cannot be reexamined in any way by this court. The argument is that one who contracts with the Government has virtually no choice concerning the contract's standard terms; not the least restrictive provision is · the Disputes clause setting out a complete arbitral system to which the contractor must submit whenever a controversy arises under the contract; the *quid pro quo* for these restrictions is, in plaintiff's view, that a decision in the contractor's favor at either of the two stages of this imposed arbitral process (by the contracting officer or the department head) may not be challenged by the Government.

■ Whatever may have been the rule or the practice before the Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§ 321–322, that statute compels us to reject plaintiff's suggestion. It is in effect asking that we read into all government contracts (with Disputes clauses) the provision that a claim otherwise properly before the court may not be decided on the merits if there was a prior administrative

determination favorable to the contractor, i. e., a clause that administrative determinations for the contractor are automatically conclusive. The standard Disputes clause does not and cannot now contain such a limitation, because the Wunderlich Act specifically prohibits the inclusion in a government contract of any clause making the decisions of an administrative official on questions of law *or* fact completely final and free from judicial review. 68 Stat. 81, 41 U.S.C. §§ 321–322. The Act, phrased in universal terms, makes no qualification or exception for administrative orders sustaining the contractor.[7] The opinions which may indicate a contrary position were all handed down before the passage of the Wunderlich legislation. In cases decided subsequent to its enactment, this court has not hesitated to reexamine administrative determinations upholding the contractor, and to upset them if the standards for review set forth in the statute call upon us to conclude that the decision below should not stand. See Copco Steel & Eng'r. Co. v. United States Ct.Cl., 341 F.2d 590, decided this day; Flippin Materials Co. v. United States, 312 F.2d 408, 417, 160 Ct.Cl. 357, 371 (1963); Associated Traders, Inc. v. United States, 169 F.Supp. 502, 505, 506–507, 144 Ct. Cl. 744, 749, 750, (1959); Northrop Aircraft, Inc. v. United States, 127 F. Supp. 597, 599–601, 130 Ct.Cl. 626, 629–633 (1955); Milwaukee Shipbuilding & Engineering Co. v. United States, 121

7. In an attempt to overcome the impact of the Wunderlich Act, plaintiff emphasizes the part of the Disputes clause specifying the procedure by which a contractor may appeal an adverse decision by the Contracting Officer, but omitting any corresponding right on the part of the Government. Plaintiff also points to Federal Aviation Agency regulations to the same effect. See 41 C.F.R. §§ 2–60.3, 2–60.6. By analogy or implication, plaintiff urges, the same policy should govern decisions by the head of the department. But the provisions relied upon by plaintiff do no more than outline the appellate procedure to be followed within the agency. Though they may be crucial when the court is called upon to dismiss a contractor's petition for failure

to exhaust administrative remedies, they are irrelevant in the present context. Rather, it is the Wunderlich Act which is determinative. The minimal bounds of judicial review must be drawn from the terms, history, and policy of that Act, not from policies speculatively drawn from the contract clauses which are themselves governed by the statute. We read the statements of commentators (cited by plaintiff), saying or implying that only the contractor may "appeal" from an adverse decision, as either referring to appeals within the agency or as suggesting the practical unlikelihood that the Government will (or will be able to) obtain judicial review as a regular matter of course.

F.Supp. 922, 927, 129 Ct.Cl. 167, 175–176 (1954). Cf. Dale Constr. Co. v. United States, Ct.Cl., No. 134–57, decided Dec. 11, 1964, slip op., pp. 27–28; Klein v. United States, 285 F.2d 778, 785, 152 Ct.Cl. 8, 21 (1961); J. W. Bateson Co. v. United States, 308 F.2d 510, 514–515 (C.A. 5, 1962).

 The legislative history of the Wunderlich Act confirms the position, implicit in the statutory language, that administrative rulings against the Government are not wholly free from judicial review. The Comptroller General had long asserted authority to examine such determinations and to deny payment on the basis of illegality. When the Supreme Court held, in United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951), that decisions under the Disputes clause were final unless fraud was alleged and proved, the Comptroller General conceded that, as a result, his powers of review had been eliminated. See Hearings on S. 2487 Before the Subcommittee on Finality Clauses in Government Contracts of the Senate Committee on the Judiciary, 82d Cong., 2d Sess. 4–13 (1952). One of the major reasons for the passage of the new Act was to assure to the General Accounting Office a limited right of scrutiny comparable to (though perhaps not precisely the same as) that given to the courts.[8] Though his power to utilize all of the Wunderlich standards has been questioned by some, the Comptroller General has asserted, since the enactment of the statute, the same authority as the courts to disallow payment of a contractor's claims notwithstanding agency decisions in the contractor's favor. See, e. g., 35 Dec.Comp. Gen'l 63, 70 (1955), and GAO decisions referred to in the articles cited in footnote 8, supra. Where the issue is one of law (e. g., interpretation of the contract), this court has upheld exercises of that power. See Associated Traders, Inc. v. United States, supra, 169 F.Supp. at 505, 506–507, 144 Ct.Cl. at 749, 750 (1959); Northrop Aircraft, Inc. v. United States, supra, 127 F.Supp. at 599–601, 130 Ct.Cl. at 629–633 (1955).[9] The present case does not, of course, require us to define the full scope of the Comptroller General's authority, but the fact that he undoubtedly has some role under the Wunderlich Act helps to demonstrate that the statute applies to administrative decisions favoring the contractor, as well as those which are adverse. A favorable determination is not removed from all examination by the courts. Issues of law, at the very least, are still open.[10]

 2. Plaintiff's second position is that only factual issues are in controversy, and the Administrator's determination of those questions must be upheld because not disputed or not shown to be unsupported by substantial evidence. The error in this formulation is

---

8. See 1954 U.S.Code Cong. & Adm'n News, pp. 2191, 2196–2197; Note, 70 Harv.L. Rev. 350, 358–59 (1956); Shedd, Disputes and Appeals: The Armed Services Board of Contract Appeals, 29 Law and Contemp.Prob. 39, 81–82 (1964); Spector, Is it "Bianchi's Ghost"—Or "Much Ado About Nothing"?, 29 Law and Contemp.Prob. 87, 108–11 (1964); Schultz, Wunderlich Revisited: New Limits on Judicial Review of Administrative Determination of Government Contract Disputes, 29 Law and Contemp. Prob. 115, 117, 132–33 (1964).

9. This and other courts have sometimes overturned Comptroller General's reversals of administrative decisions sustaining contractors, but the cases have involved errors of law or the absence of circumstances sufficient to invalidate the administrative determination under the prevailing standards. In other words, the Comptroller General has been held wrong in the particular circumstances, not devoid of all power over such favorable decisions. See, e. g., McShain Co. v. United States, 83 Ct.Cl. 405, 409–410 (1936); Albina Marine Iron Works, Inc. v. United States, 79 Ct.Cl. 714, 719–720 (1934).

10. We are dealing, it should be emphasized, with administrative *decisions* under the Disputes clause, not with compromises or settlements entered into by the parties (cf. Cannon Constr. Co. v. United States, 319 F.2d 173, 162 Ct.Cl. 94 (1963)), or with amendments duly made in the contract on proper consideration.

its disregard of the legal issue over which the parties are really quarreling. Plaintiff, it is true, sought an "equitable adjustment" under the contract, but it is too simple to say that "equitable adjustments" involve nothing but facts. The ultimate question in this case is whether the contract specifications entitle the contractor to premium payments for all the unstable soil which it removed and replaced, or for only that amount which was beneath the excavation depths stated in the contract drawings. Interpretation of the specifications is a question of law, and prior administrative determination of such issues is not binding on this court. See 41 U.S.C. § 322; e. g., Beacon Constr. Co. v. United States, 314 F.2d 501, 502, 161 Ct.Cl. 1, 3 (1963); Kayfield Constr. Corp. v. United States, 278 F.2d 217, 218–219 (C.A. 2, 1960). "Simply because an 'equitable adjustment' is involved does not automatically project the case into the category of that kind of contract dispute to which administrative finality attaches. The fundamental issue is the basic nature of the controversy. When a decision concerning the allowability of an equitable adjustment turns on the proper interpretation of * * * [specifications], then what is ultimately involved is a question of law." Kaiser Industries Corp. v. United States, Ct.Cl., 340 F.2d 322, decided Jan. 22, 1965. To the extent that it deals with questions of law, we are required to examine *de novo* the decision of the Administrator in plaintiff's favor, even though his factual findings may all be undisputed or indisputable.

■ 3. We are able to consider the issue of the defendant's liability, without a fuller administrative record than the truncated one which is available, because the physical facts relevant to that point are all undisputed. The parties disagree about the meaning of the specifications, but they do not disagree that plaintiff encountered substantial unstable soil

within the excavation depths marked by the drawing, as well as below that level. In its request to the Administrator for a reopening, the Government expressly agreed that the pertinent facts were not in dispute; before us, the defendant does not repeat that concession but it fails to suggest any relevant physical fact which is in contest or which does not appear in the Administrator's original determination. We are justified in considering the physical facts, significant to liability, as known and unchallenged.

The legal controversy over the specifications can adequately be solved, as already indicated, with the help of the parts of the administrative record appended (with the defendant's concurrence) to the plaintiff's motion for summary judgment; so far as we can tell, the hearing before the Contract Appeals Panel (which was not transcribed) brought forth no important information not contained in the papers we have or not judicially noticeable. We are also aided by the arguments and materials which the Government wished to present at the rehearing by the Federal Aviation Agency (Plaintiff's Exhibit 9, Memorandum of the Office of General Counsel of the Federal Aviation Agency, June 26, 1963, requesting a "supplemental decision" by the Administrator). This memorandum contains, we presume, those "[heretofore undecided] factual matters in dispute," to which the defendant vaguely alludes in its argument to us; the only significant "factual matters" referred to in the memorandum are an alleged trade practice of the industry and the previous practice of this particular contractor; no other "factual dispute" has been called to our attention. We shall treat this memorandum as part of the defendant's arguments against granting plaintiff's motion for summary judgment.[11] Using the administrative documents as well as the arguments made directly to the court, we turn to the substantive issues of law entwined in plaintiff's motion.

11. At the oral argument, the parties were requested to file supplementary briefs supporting their respective interpretations of the specifications—the substantive issue on which this case depends.

4. The Administrator's decision in favor of the contractor was based on the language of the apposite contract specification, the established rule that contract ambiguities are to be resolved against the author, and the best estimate of the parties' purpose in drafting the provisions concerning unstable soil.

The pertinent specification, 702–3.2 (see footnote 1, supra), begins by elaborating the procedure for normal trench excavation and backfill operations in connection with pipeline installation. It goes on to treat separately with the excavation of unstable soil. Much later in the text of the specifications, an over-all general provision (702–5.1) dealing with payment stipulates that pipeline excavation is to be compensated at the "contract unit price" ($3.93 per cubic yard). But the unit price for removal and replacement of unstable soil encountered in pipeline excavation is given in the same specification that deals with its treatment. This states, "The cost of removing unsuitable soil shall be paid for at the unit price for Unclassified Excavation for Structures * * *" (or $6.00, the unit price on which plaintiff's claim is based). The Contracting Officer concluded that, taken together, these payment provisions meant that only unstable soil removed from depths below the excavation limits stated in the contract drawings could be compensated at the higher rate. On their face, however, the specifications do not prescribe such a limitation. If anything, they indicate just the opposite since the sentence referring to the $6.00 price speaks flatly of "the cost of removing unsuitable soil", without qualification or restriction, and this specific provision can be deemed to modify the more general clause, elsewhere in the specifications, on payment for pipeline excavation. Moreover, the same specification (702–3.2) provides for the larger compensation when there is "*any* change in depth in excess of six

(6) inches (emphasis added)." If the extra payment for the removal and replacement of unstable soil were confined to excavations below the depths stated in the drawings, it would be, in large measure, no more than an unnecessary particular application of this general provision concerning changes in depth. The face of the significant specification, in short, indicates that the construction advocated by the contractor and accepted by the Administrator is the more reasonable. And if it be assumed that this government-drawn specification is ambiguous, it must be construed against its drafter. E. g., W. H. Edwards Eng'r Corp. v. United States, 161 Ct.Cl. 322, 332–334 (1963); Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947).[12]

Though the actual purpose of the parties is uncertain, there is another good ground, also accepted by the Administrator, for holding that the removal and replacement of all unstable soil was meant to be compensated for at the higher rate. Plaintiff asserts that there was no accurate means of determining the amount of unstable soil to be encountered in trench excavation for a project covering as much area as the Dulles International Airport. To prevent contractors from including in their bids an amount high enough to protect them against the possibility of overly large deposits of unstable soil, the Government, plaintiff says, provided that it would assume that risk by paying for the removal and replacement of all unstable soil at the premium rate of $6.00 per cubic yard. By this means the Government would assure itself that the competing contractors would bid reasonable rates for normal trench excavation and, at the same time, that it would pay only for the unstable material actually excavated. In support of this position, the plaintiff offered in the administrative proceedings its bid estimate work papers to show that no sum for removal and backfill in unstable areas had

12. Plaintiff also refers to other parts of the specifications, concerned with other types of excavation, which make it clear that the normal unit price is to be paid for that excavation regardless of the material encountered. The point is that the same clarity was not infused into the provisions on pipeline excavation.

been included. The Administrator seems to have been convinced that the contracting officer's determination would have improperly placed most of the risk of encountering unstable soil back on the contractor (i. e., for the cost of removing unstable soil to the depths stated in the contract drawings). We have been given no reason to disagree.

■ In attempting to counter plaintiff's reading of the specifications, defendant points to what it considers the normal trade usage, to this plaintiff's previous practice on other contracts, and to the prior dealings of the parties under this agreement. It is said that the customary practice in contracts involving trench excavation for pipelines is to submit a composite bid price which takes into account the cost of excavating unstable as well as suitable soil. Under all such contracts, defendant claims, no additional payment is made for the removal and replacement of unstable soil to the depts specified in the contract drawings. To prove the existence of the alleged trade usage and plaintiff's awareness of it, the defendant submitted, in its application to the Administrator for a new hearing, a number of sample contract specifications, including specifications used by the plaintiff in prior dealings with the Government. But each of these contracts is quite different in significant wording from the one before us, and most of them are very markedly dissimilar. Furthermore, all of those agreements explicitly provide that no additional payment is to be made for the excavation of unstable soil or indicate affirmatively by their phrasing that extra compensation is restricted to defined limits. Thus, the State of Ohio Highway Department specifications for pipeline excavation limit premium payments for the excavation of unstable soil to the portion removed "more than one foot * * * below the bottom of the pipe." Provision is made in the specifications of the Maryland State Road Commission for extra payment for such excavation only when it is "below planned elevation." Similarly, the pertinent portions of the specifications for a previous contract between plaintiff and the United States Corps of Engineers refer to unsuitable material "encountered at the elevation indicated on the drawings or specified for pipe, which will not provide a firm foundation for the pipe" and to such unstable material "under the pipe"; and, in any event, there is no way of knowing at which rate plaintiff was actually compensated. We conclude that—although there may possibly be a customary trade practice to limit the payment of premium rates to excavation of unstable soil at levels beneath those specified in the contract drawings, regardless of the wording of the particular contract—defendant has not so shown or come at all near persuading us that it can make that showing in this case. In all the specifications placed before us as examples, when the parties wish to incorporate such a limitation, they seem to do so explicitly. The specification with which we are concerned appears to state the opposite—that the excavation of *all* unstable soil is to be additionally compensated. The defendant has failed completely to make even a minimal showing, either to us or to the Administrator (in the request for reopening), that the alleged trade practice would prevail despite language suggesting the contrary. Its reliance on trade usage is therefore unsound.

■ The last of the Government's defenses, on the merits, is that plaintiff's conduct at the time of the performance of this contract shows that it did not consider itself entitled to additional compensation for the excavation of unstable soil. During the trench excavation opertions, plaintiff encountered both acceptable soil and unacceptable shale, which, like unstable soil, was unsuitable for use as backfill, and replacement for which was, in certain instances, to be compensated at a higher rate. Plaintiff exchanged this shale for acceptable material from "cut" or "borrow" areas, but, it is alleged, made no claim for extra payment. Defendant infers from plaintiff's inaction on the related matter of compensation for the removal of shale that

it understood that it was not entitled to additional payment regarding unstable soil. The leap is far too strenuous. There are many other conceivable explanations for plaintiff's failure to file a claim regarding the shale. The Government might have insisted that plaintiff separate the shale from the acceptable soil to prove its entitlement to additional compensation, and plaintiff might have deemed this task too difficult. Plaintiff might have considered the amount of the claim too piddling to bother about. Defendant has made no adequate attempt to raise the issue whether plaintiff's failure to request higher payment was due to its then construction of the specifications. In addition, such an interpretation would apparently relate to different provisions of the specifications and would be relevant here only by analogy. These weaknesses make it impossible to accept defendant's argument founded on the contractor's conduct during the course of performance.[13]

For these reasons, we uphold plaintiff's interpretation of the specifications and reject the tenuous defenses based on the wholly inadequate proffers as to trade practice, prior dealings of the parties under other agreements, and contemporaneous construction of this contract.[14]

 Since no evidence was taken, or findings made, at the administrative level on the question of the award, we may refer the case to a Trial Commissioner of this court to determine the amount of recovery under Rule 47(c). "Since neither the contracting officer nor the * * [Administrator] reached the issue of compensation or recovery, a remand under Rule [47(c)] does not contravene the requirement of the Wunderlich Act or the holding in Bianchi that departmental findings must be reviewed on the basis of the record before the agency. * * * To return the case at its present stage to the [Federal Aviation Agency] for a hearing and findings on that subject would only add to the delay which the Supreme Court sought to diminish through its ruling—without countervailing advantages." Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 863–864, 162 Ct.Cl. 802, 807–809 (1963). See, also, WPC Enterprises, Inc. v. United States, 323 F.2d 874, 880, 163 Ct.Cl. 1, 11–12 (1963); H. R. Henderson & Co. v. United States, Ct.Cl., No. 319–60, decided Jan. 22, 1965, slip op., pp. 6–7, 22; E. H. Sales, Inc. v. United States, Ct.Cl., 340 F.2d 358, decided Jan. 22, 1965.

The plaintiff's motion for summary judgment of liability is granted and the defendant's motion to dismiss or to suspend proceedings is denied. Judgment is entered to that effect, with the amount of recovery to be determined under Rule 47 (c).

13. Defendant also contends that plaintiff's original claim filed with the contracting officer related only to one of its subcontractors, while the monetary claim which it made after the favorable decision of the Administrator was for itself as well as the subcontractor. We see nothing wrong with this broader claim. The Administrator's decision in plaintiff's favor was not limited to the subcontractor's claim; rather, it related to all quantities of unstable soil removed under the contract.

14. Since these proffers are insufficient and raise no issue worthy of trial, it is unnecessary to take any evidence, and con-sequently unnecessary to reach either of these questions: (1) Whether, in a trial before a Commissioner of this court, ·a party would be precluded from offering evidence of trade usage, prior dealings of the parties, and their contemporaneous construction of the contract, because it failed to do so, in timely fashion, in the proceedings at the administrative level; (2) whether, in a suit for relief under the contract, such factual questions, which directly relate to the legal issue of the meaning of the contract, may be tried de novo in this court (a) where they have already been tried and determined administratively or (b) where the administrators have not reached those questions.