**GULF & SOUTH AMERICAN STEAM-
SHIP CO., INC., et al.**

v.

**The UNITED STATES.**

**AMERICAN EXPORT LINES,
INC., et al.**

v.

**The UNITED STATES.**

**Nos. 45-73, 57-73.**

United States Court of Claims.
July 19, 1974.

J. Alton Boyer, Washington, D. C., attorney of record, for Gulf & South American Steamship Co., Inc., and others. Kominers, Fort, Schlefer & Boyer, Washington, D. C., of counsel.

James N. Jacobi, Washington, D. C., for American Export Lines, Inc., and others; J. Alton Boyer, Washington, D. C., attorney of record. Kurrus & Jacobi, Washington, D. C., of counsel.

Emmett B. Lewis, with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before DAVIS, KUNZIG and BENNETT, Judges.

ON DEFENDANT'S MOTIONS
TO DISMISS THE PETITIONS

DAVIS, Judge:

In these parallel suits six common carriers by water, which held contracts with the United States to transport government cargo, seek recovery for the drastic increase in the price of bunker

fuel (i. e., fuel for operating vessels) which occurred in 1970–1971.[1] Effective July 1, 1970, each plaintiff had entered into two contracts, for one-year periods, with the Military Sea Transportation Service of the Navy Department (now known as Military Sealift Command, "MSC"). One pact was a "Container Agreement", the other a "Shipping Agreement"; both were largely in standard forms, were drafted by the Government, and were filed with the Federal Maritime Commission. Under these contracts the carriers undertook to transport certain types of government cargo over specified routes at stated rates. The general format of such federal agreements has been held not to violate the Shipping Act of 1916, 46 U.S.C. § 801 et seq. (1970). American Export Isbrandtsen Lines, Inc. v. Federal Maritime Comm'n, 127 U.S.App.D.C. 62, 380 F.2d 609 (1967).

The latter half of 1970 and the first part of 1971 saw a great increase in the price of bunker fuel needed to run the lines' ships. Claimants published, in accordance with usual practice, bunker fuel surcharges in tariffs filed with the Maritime Commission, and then collected the surcharge from commercial shippers. Defendant refused to pay such amounts for property transported under the Container and Shipping Agreements, contending that those contracts did not authorize such an increase. In these actions the carriers sue for the surcharges on two theories. The first (stated in Claim I of the petitions) is independent of and apart from the terms of the Shipping and Container Agreements; the other (Claim II) is pleaded directly under those contracts.

Defendant has moved to dismiss both counts of the petitions, asserting, first, that the carriers have failed to state a proper claim under either theory, and, second, that in any event this court is without jurisdiction over the suits. We discuss the merits of Claim I in Part I of this opinion, deal with Claim II in Part II, and take account of the jurisdictional contention in Part III.

I

In February 1971 the Maritime Commission ordered (36 Fed.Reg. 3849 (1971)) plaintiffs and other carriers to show cause why their failure to impose and collect a bunker fuel surcharge on government cargo carried under the Shipping and Container Agreements was not in violation of the non-discrimination and non-preference provisions of the Shipping Act of 1916, in view of the fact that the surcharge had been imposed and recovered by the carriers on commercial cargo. The Military Sealift Command intervened and participated in the proceeding (FMC Docket No. 71–17), urging (among other things) that the agreements validly imposed the risk of the price rise on the carriers, that the Commission could not order the imposition of the surcharge on the military cargo, and that if there was discrimination against commercial cargo the only remedy was to remove the impost from the commercial sector. The Commission's report and orders in this proceeding form the essential underpinning for Claim I of the petitions.[2] Claimants' position is that the Commission squarely held that the Government owed the surcharges, and that that ruling is binding here on the principle of collateral estoppel. At the same time plaintiffs make it perfectly clear that they do *not* assert that defendant has violated any provision of the Shipping Act, nor do they ask the court to find any such violations by the Government.[3]

---

1. Another related case is Sea-Land Service, Inc. v. United States, 497 F.2d 928 but that litigation does not present the issues raised in Count I of the present petitions. Count II is, however, connected with *Sea-Land* (see Part II, infra), as is one aspect of the jurisdictional defense (see Part III, *infra*).

2. The report and orders are appended to the petitions.

3. Plaintiffs and other carriers filed a separate complaint against MSC with the Commission (American Export Isbrandtsen Lines, Inc. v. Military Sealift Command,

It would serve no general purpose to take up *seriatim* all of the Commission's various statements and determinations in order to test the correctness of plaintiffs' contention that the agency decided that the Government owed the surcharges. We are satisfied that in its ultimate conclusions: (a) the Commission did not hold or purport to hold that the Government was liable for the surcharges under the Agreements or the Shipping Act; (b) the Commission did not hold in this or any other proceeding that the Government was in violation of the Shipping Act;[4] but (c) the Commission did rule that the *carriers* violated the Shipping Act by imposing the surcharges on commercial cargo while not seeking to collect it on military cargo; and in that connection, (d) all the Commission decided was that plaintiffs were obligated under the Shipping Act to *attempt* to remedy the discrimination against commercial cargo by either trying to collect the surcharges from the Government or by rescinding the surcharges against non-government shippers.

That the Commission did not hold the Government liable for the surcharges[5] is plain to us from its statement (Report of Jan. 14, 1972, p. 6) that the shipper (MSC) is beyond Commission jurisdiction "in this type of situation where no violations of the [Shipping] Act by the shipper have been alleged"; from its deliberate refusal to consider the bearing or fairness of the Agreement terms (Report, *supra*, p. 5); from its order denying reconsideration (May 1, 1972) which expressly noted that the proceeding was never enlarged

to consider any allegation that MSC had violated the Act;[6] and from its repeated references to the ASBCA which imply that that tribunal is to interpret the Agreements (Report, *supra*, pp. 4, 6, 10; Order of Denial of Petition for Reconsideration (May 1, 1972); Order of Reopening of Proceeding and Modification of Final Order (Jan. 16, 1973)). By the same token, the Commission obviously did not find the Sealift Command in violation of any part of the Shipping Act. *See also* n. 3, *supra*.

It is equally clear that the Commission did not rule that the carriers are automatically in violation of the Shipping Act unless and until they actually succeed in collecting the surcharges from the Government—no matter what the obstacles. The holding was, rather, that the lines are in violation unless and until they do all they reasonably can to *try* to collect these sums;[7] ultimate success in that endeavor was not required or mandated. The original holding of violation was entered because the Commission believed that plaintiffs were not doing all they reasonably could to attempt to recover the surcharges; when the Commission became convinced that such efforts were being made, it vacated its initial determination.

The original decision (Report of Jan. 14, 1972, p. 6) held another carrier, Sea-Land Service, Inc. "no longer in violation of any of the sections of the Shipping Act in issue" because it had imposed the surcharge on the Sealift Command "and is currently attempting to collect it by pursuing its remedy before the Armed Services Board of Contract

---

FMC Docket No. 72–10) alleging violations by the Command of the Shipping Act (in refusing to pay the surcharges) and seeking reparations. The Commission dismissed the complaint (order of Feb. 15, 1973) on the ground that it lacked jurisdiction to award reparations from a shipper to a carrier. This accords with another recent Commission decision. *See* Maritime Service Corp. v. Plaza Provision Co., FMC Docket Nos. 72–27, 72–28 (order of Jan. 15, 1973).

4. *See* footnote 3, *supra*.

5. Of course, the Commission did not rule that the Government was *not* liable; it simply did not consider or reach that issue.

6. The same order declared: "Furthermore, that argument was thought to be specious—there is no evidence whatsoever that MSC obtained transportation at less than the applicable rates by any unfair means in violation of Section 16", prohibiting undue preferences.

7. Or, alternatively, to remove the exaction from commercial cargo.

Appeals (ASBCA)." (The order entered on the report dismissed Sea-Land from the proceedings.) The next-to-last sentence of the report then said: "The alternatives available to respondents are the imposition of the surcharge and the further effort to collect it as Sea-Land Service has done in its pursuit before the ASBCA or the cancellation of the surcharge imposed against shippers of commercial cargo" (Report, p. 10).[8]

The same thread reappears in the order denying the reconsideration petition (May 1, 1972), in which the Commission decided that it was too late for the carriers (other than Sea-Land) to pursue their remedies before the ASBCA; "[t]hese were the alternatives available to the respondents at the time of the implementation of the surcharge, and not at the present, after the Commission has found them in violation of the Act."

Finally, in its order reopening the proceeding and modifying the original final order (Jan. 16, 1973), the Commission noted that the "respondents, other than Sea-Land, were considered to be in continuing violation of those sections of the Shipping Act [§§ 16 and 17] because the record at the time of decision did not show that they had sought to collect the surcharge in question from the Military Sealift Command (MSC), as had Sea-Land." The Commission then "annulled and rescinded" the determination in its final order of January 14, 1972 that the interested carriers (other than Sea-Land) were in violation of the Act, and discontinued the proceedings.[9] The reason for this change was that "the Commission's [original] decision would require respondents to perform an unnecessary and useless act. The action of Sea-Land which exonerated it from further violation of the Shipping Act was the pursuit of an appeal from MSC's refusal to pay the surcharge before the Armed Services Board of Contract Appeals, and since any decision from the Board in favor of Sea-Land would have been equally applicable to all other respondents to require them to appeal to the Board was to direct a futile gesture."

From this last order and its predecessors, it could not be clearer that the Commission held no more than that, to the extent the carriers were in violation of the Shipping Act, it was only because they had failed to make reasonable efforts to collect the additional bunker fuel charge from the defendant (or to remove it from commercial cargo). Further than that the Commission did not go; certainly it did not decide that the carriers would be in violation of the Shipping Act even if they made all reasonable efforts to collect from the Government but failed in their attempt.

■ The upshot is that the claimants cannot invoke the Commission's determination and orders as deciding that the Government is liable. On the contrary, the Commission left that issue wide open and unresolved. There is no prior ruling which could possibly provide the basis for collateral estoppel. The first count of the petitions, which is directly bottomed on the plaintiffs' erroneous view of what the Commission decided, is therefore unsound on its face and must be dismissed for failure to state a proper claim.[10]

8. The report also declared (p. 6): "Once having pursued the former alternative, the imposition of the surcharge on military cargo, followed by resort to the ASBCA, a respondent would have done all it can as far as the Commission is concerned since the shipper (MSC) is beyond its jurisdiction in this type of situation where no violations of the Act by the shipper have been alleged."

9. Defendant urges that this order of January 16, 1973, completely annulled and rescinded

the entire report and order of January 14, 1972. Plaintiffs counter that still outstanding is a portion of the original order calling upon the carriers to cease and desist from further violations of the Act. We need not attempt to resolve this controversy since, for our purposes, it is immaterial whether or not plaintiffs remain under the obligation to try to collect the surcharges.

10. Plaintiffs also say that Claim I would be good even if confined to the "barebones" allegations that plaintiffs, common carriers

## II

The allegations in Claim II of the petitions present substantially the same cause of action as in Sea-Land Service, Inc. v. United States, 497 F.2d 928—that plaintiffs are entitled to recover the bunker fuel surcharges under the Cost Responsibilities clauses of the Container and Shipping Agreements.[11] The ASBCA rejected Sea-Land's claim (72-2 BCA ¶ 9605), and that carrier filed suit here. Both sides moved for summary judgment on the merits. On May 31, 1974, after argument, the court, by order, remanded Sea-Land to the Armed Services Board of Contract Appeals to determine whether the drastic increase in the cost of bunker fuel, on which the plaintiff predicated its claim, was foreseen by that plaintiff when it entered into the contract or was reasonably foreseeable at that time as likely to arise during the contract period. The court was of the view that the "ultimate disposition of the case will be facilitated and may be quickened by following that course."[12] We would, of course, want

---

subject to the Shipping Act, provided transportation service for defendant, for which the latter has refused to pay in full without lawful excuse. On that reading, however, the claim would have no identity separate from that of Claim II which alleges that the carriers are entitled to recover under their agreements. Aside from the Maritime Commission's determination and order—which we have just rejected as the basis for a claim—plaintiffs put forward nothing except their contracts. There is no contention that the agreements are invalid, and their general legality has been upheld. American Export Isbrandtsen Lines, Inc. v. Federal Maritime Comm'n, supra, 127 U.S.App.D.C. 62, 380 F.2d 609 (1967). If the contracts are valid, as we must assume, they embody the plaintiffs' arrangements with the Government and no recovery can be had contrary to their provisions.

11. Article I:9 of the Container Agreement provided:

"(a) As a means of facilitating the administration of this Agreement, the parties have agreed that certain specific items of cost anticipated as likely to arise in the performance of their respective duties under Articles I:5, I:6 and I:8 shall be listed, and the cost responsibilities of the parties indicated, in a schedule attached hereto as Appendix B (MSTS Form 4280/7B) and made a part of this Agreement. Determinations of responsibility for specific items of cost agreed to by the parties under this Article are to be consistent with the general language of Articles I:5, I:6 and I:8; provided, however, in the event of conflict, the specific language of Appendix B shall prevail.

"(b) Either party may nominate changes to or additional items of cost and cost responsibility to be incorporated into Appendix B. Such nominating party shall serve upon the other party a written nomination, together with a detailed statement of all pertinent facts and appropriate supporting data

necessary for a determination of the cost responsibility under Articles I:5, I:6 and I:8. If the other party agrees in writing to the nomination, such nomination will be incorporated into Appendix B as of the agreed effective date. Failure of the other party to agree to the nomination within a period of thirty (30) days from its receipt, or within a mutually agreeable greater period, shall constitute a dispute concerning a question of fact within the meaning of that term in the Article entitled "Disputes" in Part III of this Agreement."

The Shipping Agreement embodied a comparable, though slightly different, Cost Responsibilities provision.

12. The body of the order is as follows:

"For the purposes of their motions for summary judgment, both parties have assumed that the drastic increase in the cost of bunker fuel, on which plaintiff predicates its claim, was neither foreseen by plaintiff when it entered into the contract on July 1, 1970, nor reasonably foreseeable at that time as likely to arise during the contract period. The Armed Services Board of Contract Appeals made the same assumption and did not, in view of its legal holding, determine the factual correctness of that assumption. The materials and arguments presented to the court on these cross-motions for summary judgment do not show either that the defendant concedes the correctness of the assumption or that there can be no proper dispute over the point. Without passing in any way at this time upon the legal issue of whether plaintiff can recover if the basic factual assumption is in fact correct, the court is of the view that there should first be a definitive determination of that factual question. The ultimate disposition of the case will be facilitated and may be quickened by following that course. The appropriate tribunal to make the factual finding in the first instance is the Armed Services Board of Contract Appeals, and the

the same information before deciding the merits of Claim II in the present petitions.

The six plaintiffs all appealed to the ASBCA from the administrative denial of their demand for the surcharges under the Cost Responsibilities article. Five of these appeals have not been decided on their merits; some still remain on the Board's docket but have been informally stayed; the others were dismissed for technical reasons, but in effect remain pending because they are expressly subject to reinstatement upon the disposition of the *Sea-Land* litigation.[13] Defendant maintains that Claim II cannot be pursued until the Board proceeding is completed and the Board remedy exhausted. The carriers reject this contention, urging that the count is ripe for decision here in view of the decision of the ASBCA in *Sea-Land* adverse to the shipping lines' position.

The lead given by our recent *Sea-Land* order makes it unnecessary to determine whether or not plaintiffs have as yet adequately exhausted their administrative remedy. In either event there still remains the undecided issue of whether the drastic increase in the cost of bunker fuel, on which plaintiffs predicate their claims, was foreseen by them when they entered into the contracts on July 1, 1970, or was reasonably foreseeable at that time as likely to arise during the contract period. These cases should be remanded to the ASBCA for that determination, as in *Sea-Land*, since the court believes that, here too, there should first be a definitive determination of that factual question before a judicial decision is rendered on the legal question of the scope and coverage of the Cost Responsibilities clause.

The plaintiff carriers have argued that the controversy under the Cost Responsibilities clause raised in Claim II is not subject to the disputes procedure since no factual issue is in dispute. Without agreeing in any way that issues under the Cost Responsibilities article need go to the Board only where there is a dispute over the facts (*cf.* Zidell Explorations, Inc. v. United States, 427 F. 2d 735, 737, 192 Ct.Cl. 331, 335 (1970) ), we point out that in any case plaintiffs' assumption is no longer accurate since our *Sea-Land* order singled out a significant issue of fact which appears to the court to be still unsettled.

In the present cases, unlike *Sea-Land*, the parties have not addressed any of the merits of the carriers' claim under the Cost Responsibilities article. With respect to Claim II, they have limited themselves to questions of jurisdiction and whether the administrative remedy has been adequately pursued. The court, however, need not be confined by the parties' presentation if that turns out to be too constricted; within its powers and jurisdiction the court can make the appropriate disposition in the particular case in the interests of justice. In this instance we have power under Pub.L. 92–415, 86 Stat. 652, and 28 U.S.C. § 1651(a) to remand to the ASBCA to decide the issue we have des-

---

case should be remanded for that purpose.

"IT IS THEREFORE ORDERED that (a) the case is remanded to the Armed Services Board of Contract Appeals, under Public Law 92–415 and General Order No. 3 of 1972, to determine whether the drastic increase in the cost of bunker fuel, on which plaintiff predicates this claim, was foreseen by plaintiff when it entered into the contract on July 1, 1970, or was reasonably foreseeable at that time as likely to arise during the contract period;

"(b) plaintiff's attorney shall be responsible for keeping the court advised periodically as to the status of the proceedings on remand; and

"(c) if further proceedings are had in this court after completion of the remand proceedings, the parties shall be free to raise and present, in addition to contentions relating to issues arising out of the remand proceedings, the issues and arguments presented on the current cross-motions for summary judgment."

13. The appeal of plaintiff United States Lines was dismissed on the merits by the Board in August 1972, after it had decided *Sea-Land*. *See* 72–2 BCA ¶ 9655.

ignated above. Since the plaintiffs have all duly appealed to that Board, there is no problem of an untimely appeal such as defendant thought to be a bar in such cases as William Green Constr. Co. v. United States, 477 F.2d 930, 937, 201 Ct.Cl. 616, 627–628 (1973), cert. denied, 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974).

Remand of Claim II for that purpose is wholly appropriate since it will put these cases on a par with *Sea-Land*, and will give us information we believe necessary before we decide, if we have to, the coverage and application of the Cost Responsibilities clause. It serves the economy of both court and parties to set in motion the process of obtaining the factual findings we desire, without waiting for further motions by one side or the other. There is, moreover, no unfairness to the parties in going beyond the limited questions they have argued. These cases were presented to the court in tandem with *Sea-Land* and it should be no surprise that the court treats them as linked. In addition, the disposition we order does, as a matter of fact, direct itself to the question of remedy-exhaustion canvassed by the litigants; similarly, the remand aids with the disposition-for-the-present of the jurisdictional problem which is the other matter argued on Claim II (*see* Part III, *infra*).

Accordingly, we shall remand Claim II of these cases to the ASBCA for the same type of determination as in *Sea-Land*.

### III

The alleged jurisdictional bar to the suits is that both claims are necessarily based upon maritime contracts of carriage and must be brought in a District Court under the Suits In Admiralty Act, 46 U.S.C. § 741 et seq. (1970). The defendant asks that we dismiss the actions or transfer them to a District Court under 28 U.S.C. § 1506.

This issue need not be faced with respect to Claim I since we have decided, in Part I, *supra*, that (assuming jurisdiction) the count must anyway be dismissed for failure to state a proper claim. That disposition bypasses the jurisdictional defense. *Cf.* Monett v. United States, 419 F.2d 434, 435–436, 190 Ct.Cl. 1, 4–5 (1969), cert. denied, 400 U.S. 846, 91 S.Ct. 91, 27 L.Ed.2d 82 (1970).

As for Claim II, the question has already been partially resolved. With regard to the Container Agreement, the same defense was raised earlier in the *Sea-Land* litigation, and was denied by the full court, in an order dated March 30, 1973, on the authority of Alaska Barge & Transport, Inc. v. United States, 373 F.2d 967, 179 Ct.Cl. 216 (1967). This panel cannot, of course, depart from that *Sea-Land* decision of the full court, and defendant has given us no reason to suggest to the court en banc that it reconsider the order of March 30, 1973. The Container Agreement involves inland as well as ocean carriage. The contract is therefore not purely maritime, and the non-maritime features are both significant and not properly severable from the maritime features. Under *Alaska Barge & Transport, Inc.*, as well as other decisions, this court has jurisdiction.

The Shipping Agreement is different since it provides only for ocean transportation. Plaintiffs urge us to exercise pendent or ancillary jurisdiction because the issues under the Cost Responsibilities articles of both sorts of agreement are precisely the same, and disposing of all claims in one litigation would further the dictates of judicial economy, fairness and common sense. Defendant asserts that we have no such authority. But at the present phase of the litigation we need not reach this problem of whether we have or should invoke such pendent or ancillary jurisdiction (*cf.* Eastport S.

S. v. United States, 372 F.2d 1002, 1012–1013, 178 Ct.Cl. 599, 613–614 (1967) ). At the least, there is jurisdiction, as we have just reaffirmed, over the Container Agreement aspect of the petitions, and that power is enough to remand the cases to the ASBCA as we have done in Part II, *supra*. If these suits come back to this court on completion of the remand proceedings, the defendant can then raise anew, if it wishes, the jurisdictional defense as against our consideration and determination of the Shipping Agreement segment of the litigation.

### IV

On these grounds, we grant the defendant's motion to dismiss the petitions insofar as Claim I is concerned. That count is dismissed. As for Claim II, we deny the motion to dismiss (or transfer) but remand the cases to the Armed Services Board of Contract Appeals, under Public Law 92–415 and General Order No. 3 of 1972, to determine whether the drastic increase in the cost of bunker fuel, on which plaintiffs predicate Claim II, was foreseen by plaintiffs when they entered into the contracts on July 1, 1970, or was reasonably foreseeable at that time as likely to arise during the contract period. Of course, the Board may, in its discretion try or consider these issues in the present cases along with the *Sea-Land* proceeding on remand. Plaintiffs' attorneys shall be responsible for keeping the court advised periodically as to the status of the proceedings in the present cases on remand. If further proceedings are had in this court after completion of the remand proceedings, the parties will be free to raise and present, in addition to contentions relating to issues arising out of the remand proceedings, any issues and arguments then relevant to Claim II of the petitions, including the jurisdictional defense to inclusion of the Shipping Agreements in that claim.