522

ITT FEDERAL SUPPORT SERVICES,
INC.

v.

The UNITED STATES.

No. 138–73.

United States Court of Claims.

March 17, 1976.

Gilbert A. Cuneo, Washington, D.C., attorney of record, for plaintiff, Harvey G. Sherzer, Sellers, Conner & Cuneo, Washington, D.C., and James V. McMahon, Nutley, N.J., of counsel.

Sheldon J. Wolfe, Washington, D.C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D.C., for defendant.

Before COWEN, Chief Judge, and DAVIS and KASHIWA, Judges.

DAVIS, Judge:

This case, before us on the parties' cross-motions for summary judgment, is a tug of war between a government contractor and the Government over surplus moneys in a pension fund established for the cost-plus contractor's employees. Three sums are involved: (1) $821,572 in post-contract-termination earnings and profits on the government-reimbursed employer's share of the pension plan contributions (Sum 1); (2) $89,780 in post- and pre-termination earnings and profits on the employees' share of the pension plan contributions (Sum 2); and (3) an estimated $300,000 claimed by plaintiff as *quantum meruit* compensation for its management of the pension fund after the termination of the contract (Sum 3). Plaintiff seeks to recover Sums 1 and 2, or Sums 2 and 3, or Sum 1, 2, or 3 alone. The Government denies plaintiff's entitlement to any recovery.

Shortly after entering into a cost-plus-fixed-fee contract to provide support services for the Atomic Energy Commission and AEC contractors, plaintiff ITT Federal Support Services, Inc. (ITT/FSS) established a pension plan for employees working for plaintiff under the AEC contract. Irving Trust Company of New York became the trustee of the pension plan, funded by contributions from ITT/FSS and its employees. The Government reimbursed ITT/FSS for its $2,612,857 in contributions to the fund. The employees' share was carved out of the funds handed over by the Government for employee wages.

In April 1971 the AEC directed ITT/FSS to reduce its work force under the contract and then gave the contractor two months' notice of termination for convenience. By the end of August 1971 plaintiff had transferred some support services and the employees remaining after the reduction-in-force to another government contractor. However, the pension fund and administration of the pension plan were not then transferred—despite ITT's insistence on the immediate termination of all benefit plans—because ITT and the Government could not agree on the disposition of the pension benefits between the terminated and the transferred employees, and also because ITT wanted the AEC to obtain written confirmation of an informal Internal Revenue Service opinion about the closeout of the pension plan.

The formal IRS opinion was issued on May 2, 1972, and ITT/FSS and the AEC renewed discussion of the closeout of fringe benefits (including the pension plan) at about that time. Pursuant to an AEC authorization of May 25, ITT purchased, on August 29, annuities to satisfy the pension rights of its terminated employees. Negotiations on the disposition of the remaining pension assets continued and ultimately resulted in an agreement under which ITT/FSS turned over to the successor contractor, in care of the AEC, $1,607,346 to satisfy the rights of the transferred employees. This agreement of February 1973 declared that the AEC would save and hold ITT/FSS harmless from and against all claims, actions, and liabilities arising out of the transfer of funds that might be asserted by any transferred employees, and that neither the fund transfer nor the agreement would prejudice the right of either party to the surplus remaining in the pension fund. As already indicated, a substantial surplus was left after the purchase of the annuities for the separated workers and the large transfer of pension funds to the successor employer.

In March 1973 the Government gave the two weeks' notice called for in the February agreement of its intent to recover—by way of set-off against other amounts due the ITT Corporation from the Government—the surplus in the pension fund. In response, ITT/FSS agreed to pay over to the AEC the fund's balance. This letter agreement, dated March 30, contained hold-harmless and reservation-of-rights clauses simi-

lar to those in the February agreement. This suit followed immediately.

Although ITT/FSS's pleading and briefs are broken into three counts and arguments, some themes and contentions run throughout the papers. Unravelling these common threads at the outset will simplify our subsequent disposition of plaintiff's specific claims to the three sums.

The major theme is the allegation that the post-termination management of the pension plan was not work under the contract or "as a result of employment under the contract." As a corollary, the plaintiff states that "the cost allowability provisions were no longer operative at the time the earnings and profits in question accrued. * * * Thus, plaintiff could not have recovered any fringe benefits *costs* in that time period * * *." Plaintiff's Motion for Summary Judgment at 21. These allegations reflect too narrow a view of work under the contract. This was, it must be remembered throughout, a fully reimbursable contract in which all appropriate costs were underwritten by the AEC. Prior to termination, the administration of the pension plan clearly was incident to the performance of the contract, which required plaintiff to furnish administrative services, authorized the establishment and maintenance of the pension plan, and treated the costs of the pension plan and other fringe benefit costs as allowable for reimbursement. The administration of the plan did not cease to be incident to the contract upon termination. On the contrary, the contract contemplated plaintiff's continued administration of the plan after termination; as amplified by a letter of understanding, the contract declared post-termination fringe benefit costs incurred "as a result of employment under the contract" to be allowable costs and additionally provided for the payment of a fixed fee for plaintiff's post-termination closeout work on the plan. In actual practice, too, the parties expressly recognized that plaintiff's post-termination pension plan work was un-

der the contract; ITT/FSS billed and the Government paid allowable costs and a fixed fee as called for by the contract for the period between termination and the plaintiff's transfer of the plan to the successor contractor.[1] Thus, both the contract and the parties considered the pension plan work to be incident to the performance of the contract and they continued the operation of the cost provisions through the post-termination time during which the earnings and profits at issue accrued. Despite its current legal arguments, plaintiff did in fact recover fringe benefit costs in that period.

In a connected theme, ITT/FSS says repeatedly that the AEC unilaterally delayed the transfer of the pension plan and the termination of plaintiff's administration of the plan. Affidavits submitted by the Government and not countered by the plaintiff ascribe the delay in pension plan closeout to disagreements between the parties over the disposition of the pension funds and to the time required to obtain the formal IRS ruling requested by ITT/FSS. These are not matters for which the Government can be held exclusively responsible; the AEC did not unilaterally delay the pension closeout. The result is that the entire span involved here came under the termination clauses and their provision that continued administration of the pension plan constituted work under the contract.

Plaintiff then contends that, in any event, post-termination losses on the pension plan assets would not have been reimbursable and therefore that after termination it had to assume all the risks inherent in managing the plan's assets. We cannot sustain this position either. Although the Government admitted in answer to plaintiff's interrogatories that the AEC has never reimbursed post-termination pension fund or similar losses, it also explained that no contractor has ever sought such reimbursement. Plaintiff can therefore draw no support from the AEC's prior practice. Further, since the allowable cost provisions,

1. The plaintiff has not denied its receipt of the fixed fee and reimbursement for certain post-

termination costs associated with the pension plan.

as applied to pension plan costs, remained in effect throughout the termination period, post-termination losses would have been treated in the same way as pre-termination losses—as reimbursable if they had met the requirements of the provisions governing allowable costs.[2] The key here is that we have no basis for differentiating the status of post-termination losses and risks from the status of pre-termination losses and risks. Such differentiation is crucial to plaintiff's claim that it was entitled to earnings and profits or to special compensation in the period after termination even though it was in no way entitled to either prior to termination.[3]

In the light of this discussion we now consider separately the plaintiff's claim to the three different sums outlined at the beginning of this opinion.

 *Sum 1—the post-termination earnings and profits on the employer's share.* Plaintiff posits its claim to Sum 1 on the following syllogism: There can be no credits returnable to the Government where there could not have been an allowable cost; post-termination losses on the pension plan assets would not have been allowable costs; therefore, post-termination gains, the cor-

relative of the losses, cannot constitute credits returnable to the Government. As we have already indicated, this reasoning is faulty. Plaintiff has neither proved, nor shown that it could prove, that losses on pension fund assets became unallowable costs upon termination of the contract.[4] Moreover, ITT/FSS's contributions to the pension fund and its costs of administering the fund were fully reimbursable (and reimbursed), so there were allowable costs to which the credits can be applied.[5] Most importantly, as we now show, the contract as a whole gives the Government the right to any surplus.

In addition to the pertinent provisions, pointed out above, which made it clear that administration of the pension fund in the post-termination period was reimbursable and compensable contract work, the contract contained several clauses which, taken together, strongly suggest that any surplus in the pension assets was to belong to the Government. One provision called upon the contractor, on termination of the work, to furnish

> an assignment of the Contractor's rights to any refunds, rebates, allowances, accounts receivable, or other credits ap-

---

**2.** Those provisions make losses meeting certain tests reimbursable unless explicitly excluded by other contract terms. The express exclusion to which plaintiff has pointed disallows "[l]osses * * * on, or arising from the sale, exchange, or abandonment of Contractor's capital assets, including investments; * * *." Losses on assets of the pension plan paid for with government money certainly are not the losses addressed by this clause which is concerned with the company's own private assets. The other loss-exclusion provisions are also inapplicable. Consequently, losses on these assets were reimbursable if they satisfied the restrictions of the clause defining allowable losses and the general allowable cost requirements.

It is on these requirements that losses on pension plan assets might have stumbled if they had occurred and been submitted as allowable costs. To be reimbursable, costs had to be actually incurred by the contractor and losses had to be sustained by it. Losses on the assets of the pension plan would not have affected plaintiff. The terms of the pension plan shielded ITT/FSS from liability for benefits; losses simply would have reduced the fund and the size of the share to which each employee

was entitled. That being so, the disallowance of any losses merely would have reflected that the pension plan assets were not plaintiff's and that losses were not injurious to plaintiff. In short, ITT/FSS faced no risk. Plaintiff understandably does not address this basis for non-reimbursement of any potential losses.

**3.** *See* note 4 and discussion of Sum 3 *infra.*

**4.** Plaintiff has not claimed and could not claim entitlement to pre-termination earnings and profits on contributions reimbursed by the Government. Implicit in its argument that it is entitled to post-termination earnings on such contributions because post-termination losses would not have been reimbursed is the assumption that post-termination losses were different from pre-termination losses. As we have shown, post-termination losses would have received the same treatment as pre-termination losses.

**5.** There are indications that the surplus resulted because the allowable costs, and therefore the Government's reimbursements, exceeded the amount necessary. *See* note 6 *infra.*

plicable to allowable costs under the contract; [Art. VI, ¶ F.1.]

The employer's contributions to the pension fund were paid from a special bank account as to which the contract specifies:

> Title to the unexpended balance of any funds advanced and of any bank account established pursuant to this article shall remain in the Government * * *. It is understood that * * * the Contractor acquires no right, title, or interest in or to such advance other than the right to make expenditures therefrom as provided in this article. [Art. VI, ¶ D.]

Even more significant are two provisions, the first a general one and the second directed expressly to the pension plan:

> All revenues other than the Contractor's fixed fee or fees, if any, accruing to the Contractor in connection with the work under this contract shall be Government property and shall be deposited in the Special Bank Account to be available for payment of allowable cost under this contract. [Art. VI, ¶ I.]

> The method by which the Commission shall recover any surplus monies which may accrue under the [Pension] Plan as a result of employee turnover, contract expiration or termination or for any other reason shall be in accordance with the provisions of a separate agreement between the parties. [Appendix B, Art. V, ¶ A.4.b.]

In connection with the latter, any inability of the parties to agree on the method by which the Government is to recover the pension plan surplus does not negate the Government's basic contractual right (to the surplus) which underlies this clause.

An additional overriding factor favors the Government's retention of Sum 1. This amount represents earnings and profits on the $2,612,857 in employer contributions reimbursed by the Government. As in *Northrop Aircraft, Inc. v. United States,* 127 F.Supp. 597, 130 Ct.Cl. 626 (1955), "To hold in plaintiff's favor here would, consequently, result in the Government's furnishing plaintiff with money which the plaintiff in turn could reinvest solely for its own profit. This could hardly have been the intention of the contract." *Id.* at 630, 127 F.Supp. at 599. If ITT/FSS were right, it would acquire $821,572 without any investment of its own funds. It believes it deserves this increment because its management of the fund produced the surplus [6] and because that management was allegedly necessitated by the Government's unilateral delay in closing out the plan after termination. However, ITT/FSS could not "earn" the profits on another's money simply by performing management services; at the most, it could earn compensation for its work.[7] And as we have seen, the Government did not by itself delay the pension plan closeout; the plaintiff contributed to that lag.

In sum, both the terms of the contract and equitable considerations mandate the Government's retention of Sum 1 and the denial of this aspect of plaintiff's claim.

*Sum 2—the earnings and profits on the employees' share.* The contract provisions that undergird the Government's right to Sum 1 also lead us to uphold its retention of Sum 2. Those terms distinguish this case from those relied on by plaintiff, *RMK–BRJ,* 74–1 B.C.A. 49,892 (1974), and *California Institute of Technology,* 69–1 B.C.A. 35,404, *aff'd on reconsideration,* 69–2 B.C.A. 36,715 (1969), in which Boards of Contract Appeals awarded to the employers rather than the Government the portions of insur-

---

**6.** There is some question as to what management activities plaintiff performed. The pension plan agreement stated that the management of the funds would be in the hands of the trustee or trustees appointed by ITT/FSS's Board of Directors. Shortly after the plan was established, the Irving Trust Company was named trustee, and it has been separately paid.

In addition, there is evidence that the surplus occurred solely because the contributions reim-

bursed by the Government and paid by the employees exceeded the necessary amount. According to plaintiff's own consultant, the surplus occurred due to erroneous actuarial calculations, calculations that were made by plaintiff. Thus, plaintiff seeks the benefit of its own errors, which caused the Government to incur extra expense under the cost-reimbursement phase of the contract.

**7.** *See* discussion of Sum 3 *infra.*

ance premium refunds attributable to employee contributions. In *RMK–BRJ* the Armed Services Board of Contract Appeals denied the Government's claim to the entire refund because the government contract in that case contained this "language determinative of the appeal": "The Contractor agrees that any refunds * * * shall be paid by the Contractor to the Government, *to the extent that they are properly allocable to costs for which the Contractor has been reimbursed by the Government under this contract.*" 74–1 B.C.A. at 49,895 (emphasis supplied by the Board). The contract in *California Institute of Technology* contained an identical provision (*see* 69–2 B.C.A. at 36,717 (opinion on reconsideration)); the NASA Board of Contract Appeals concluded that the Government was not entitled to the employees' share of the premium refunds because no contract term entitled the Government to that share and relevant regulations limited "applicable credits" to the share of premium refunds proportionate to the premium costs reimbursed by the Government. *See* 69–1 B.C.A. at 35,413, 35,411; 69–2 B.C.A. at 36,717. Unlike the *Cal Tech* and *RMK–BRJ* contracts and regulations, the ITT/FSS agreement directly covers the Government's right to the sum at issue, and fails to limit the Government's share of the pension surplus to the proportion of reim-

bursed costs to total costs. Thus, the contract at bar entitles the Government, as between plaintiff and the AEC, to all revenues accruing to the contractor [8] and to any pension plan surplus, without regard to its source or cause.[9] Accordingly, we deny plaintiff's claim to Sum 2.

*Sum 3—compensation quantum meruit for managing the pension fund post-termination.* Plaintiff's third claim differs strikingly from its first two. Here, plaintiff claims entitlement to compensation, *quantum meruit*, for its post-termination management of the pension fund. This claim has some superficial appeal, but a clear understanding of plaintiff's request, against its background, necessarily leads to its rejection. Plaintiff is not asking to be reimbursed for its costs incurred or for the time spent by its employees in the administration of the plan. As plaintiff acknowledged in answers to the Government's interrogatories, the Government has already reimbursed costs and payments for the services of employees, consultants, and advisors; and the letter agreement of February 1973, which provided for the payment by the Government of allowable costs and a fixed fee for ITT/FSS's work through that month, settled all possible claims for reimbursement of costs.[10] Plaintiff instead demands a "management fee" in the form of a cut of the pension plan profits.[11]

**8.** An exhibit submitted by the plaintiff indicates that, in the plaintiff's view, the earnings and profits on funds contributed by its employees should be considered revenues accruing to it, the contractor, rather than to the employees. The exhibit, a letter from a consultant, states that the entire surplus resulted from erroneous actuarial calculations. By the terms of the pension plan agreement, the plaintiff had the right, as between it and its employees, to such a *s* urplus.

**9.** Although plaintiff's former employees might have some equitable claim to this sum, the earnings and profits on their contributions, we cannot consider that potential claim. The employees are not parties to this action, and we must decide between ITT/FSS and the Government. The terms of the contract impel us to choose the latter. From the standpoint of pure equity, neither of the present parties has a clear right to this sum, but a consideration related to the employees' possible rights, and

the liability that will result if those rights are effectuated, gives the Government some equitable edge. In letter agreements, the Government has agreed to hold plaintiff harmless against claims by former employees, so the Government will bear any liability to the employees should they assert claims.

**10.** By contract requirement, plaintiff would have had to pursue any dispute over the amount received for costs and fixed fee through the contract disputes procedure.

**11.** In its answers to the Government's interrogatories, plaintiff stated that the amount it received for post-termination costs and services in connection with the pension plan "does not include any profits or fees to plaintiff for services in connection with the risks taken and/or the successful management of the ITT/FSS Pension Plan," and explained that the $300,000 requested "represents approximately one-third of the surplus in the ITT/FSS Pension Plan

The contention is that an implied-in-fact agreement giving it the right to this *quantum meruit* recovery arose upon the termination of the formal contract and the failure of the Government to relieve plaintiff of the administration of the pension plan. There is, however, no basis for finding such an implied-in-fact contract which would support recovery. The express contract between ITT/FSS and the Government provided for the Government's payment of ITT's costs and an additional fixed fee for ITT's post-termination work on the pension plan, and contemplated plaintiff's continued performance of the pension plan administrative services performed before termination. To be entirely unrelated to the express contract,[12] the implied contract would at the least have to require ITT/FSS to assume some duties different from those under the formal agreement. Plaintiff has not shown the requisite meeting of the minds, inferable from the parties' conduct, on such a separate contract. *Somali Development Bank v. United States*, 508 F.2d 817, 822, 205 Ct.Cl. 741, 751 (1974); *Cities Service Gas Co. v. United States*, 500 F.2d 448, 451–52, 205 Ct.Cl. 16, 23–24 (1974).

As the foundation for the implied agreement, plaintiff asserts that the Government knew plaintiff wished to be relieved of the plan's administration immediately after the termination; that the Government failed so to relieve ITT immediately, that ITT therefore had to "assume" all of the risks inherent in managing and investing the pension plan funds and did assume those with the Government's tacit approval, and that the Government must have known that it would not manage the plan without expecting compensation. These factors do not show the existence of an implied contract unrelated to the express contract. Of course the Government knew that the plaintiff would expect compensation for its continued administration of the plan, but the express contract provided for continued payment of costs and a fixed fee, and the Government paid those. Plaintiff has alleged nothing to show the Government's understanding that it would pay plaintiff additional compensation.

The lack of agreement on additional compensation might be irrelevant if the Government had foisted on plaintiff obligations and risks different from those under the express contract. An implied contract calling for plaintiff's acceptance of such duties and risks would carry with it an implied promise to pay reasonable compensation, and the Government would be liable for the compensation unless its prior payments satisfied the obligation. *See Cities Service Gas Co. v. United States*, 500 F.2d 448, 452, 456–57, 205 Ct.Cl. 16, 24, 32 (1974). However, plaintiff has not shown that it assumed any new obligations and risks after contract termination. In its own words, plaintiff *continued* to manage the pension plan assets. Plaintiff has not give us any reason to believe that its risks changed after termination.[13] It occupied the same position after termination as it occupied before, performing the work required by the express contract and receiving the compensation provided by that contract. There is no

Trust Fund. This is the amount which plaintiff believes and will prove that it was entitled to under currently prevailing business practices as its fee for assuming the risks inherent in and the successful management of the Pension Plan assets after the termination of the Operating Contract."

12. The implied contract, if it is to be valid, must be entirely unrelated to the express contract. The existence of an express contract precludes the existence of an implied contract dealing with the same subject. *See, e. g. Klebe v. United States*, 263 U.S. 188, 192, 44 S.Ct. 58, 59, 68 L.Ed. 244, 247 (1923); *Algonac Mfg. Co. v. United States*, 428 F.2d 1241, 1255, 192

Ct.Cl. 649, 673 (1970); *Swanson v. Levy*, 509 F.2d 859, 861 (9th Cir. 1975), citing *Rogers v. American President Lines, Ltd.*, 291 F.2d 740, 742 (9th Cir.), *cert. denied*, 368 U.S. 901, 82 S.Ct. 179, 7 L.Ed.2d 95 (1961).

13. The only risk to which plaintiff has pointed is that unallowable losses would occur. The contract and the conduct of the parties show that the allowable cost provisions relevant to the pension plan remained in effect through completion of the plan's closeout, so the termination of the contract did not change the risk of loss. *See* note 2 *supra* and accompanying text.

room for the implication of a contract giving plaintiff more. *See* note 12 *supra.* At best, plaintiff is impermissibly trying to squeeze into the mold of implied agreement its belated dissatisfaction with the provisions in the express contract for compensation of and reimbursement for post-termination work on the pension plan.

The sum of it is that we find no basis for any recovery by the plaintiff. The Government's motion for summary judgment is granted, the plaintiff's motion is denied, and the petition is dismissed.