**NORTHROP AIRCRAFT, Inc.,**
v.
**The UNITED STATES.**
No. 527–53.

United States Court of Claims.
Jan. 11, 1955.

Sidney H. Wall, Los Angeles, Cal., for plaintiff. George Gore, Hawthorne, O'Melveny & Myers, Graham L. Sterling, Jr., Bennett W. Priest, and Nevins D. Young, Los Angeles, Cal., were on the briefs.

Carl Eardley, with whom was Asst. Atty. Gen. Warren E. Burger, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

The plaintiff brought this action to recover certain moneys which it alleges the Government withheld illegally when it settled plaintiff's contracts. These contracts involved work and services to be performed on a cost-plus-fixed-fee (CPFF) basis. The contracts were executed and performed during World War II. In some of them plaintiff was prime contractor and in others was a subcontractor.

The full terms of the contracts are not before us, but the parties have stipulated that they provided that the "plaintiff would be currently reimbursed for its expenditures which were allowable under the provisions of the contracts and of T.D. 5000."

Early in 1944 the State of California advised plaintiff that its contribution rate to the Unemployment Insurance Fund for the previous year had been erroneously set at 1 percent and that the proper rate was 2.7 percent for which an additional assessment would be made. Plaintiff protested this additional assessment as illegal and, having exhausted its administrative remedies, was ordered to pay. Plaintiff made payment under pro-

test from its own funds on March 31, 1944.

Plaintiff could have commenced proceedings to enjoin collection of the tax, but this course was not taken because the final decision in such a suit might well have been delayed beyond June 30, 1944, which was the last date on which payments of the State unemployment tax could be credited against the Federal unemployment tax. If such course had been pursued and the outcome of the suit had been unfavorable to the plaintiff, it might thus have been required to pay both the State and Federal unemployment taxes, without any corresponding credit.

Instead, plaintiff determined to pay the tax and sue for refund. Since a good part of the tax was allocable to the CPFF contracts here in question, plaintiff's assistant general counsel communicated the facts of the case to defendant's contracting officer. By letter of April 13, 1944, plaintiff advised of the institution of suit to recover the tax and "agreed" to proportionately credit the CPFF contracts with "any funds recovered in said litigation."

A subsequent letter from the contracting officer detailed the Government's position in the matter. This letter does not appear to have been responsive to the plaintiff's previous letter since it asked for the agreement which the plaintiff had already given and assumed that the plaintiff had not yet filed its suit. One may surmise, therefore, that the parties had communicated otherwise with one another and that the letters were more in the nature of stating their formal positions. The Government took the view that the tax case presented a disputed legal question; that employers' payments of Federal and State unemployment insurance taxes are allowable items of cost; that plaintiff's payments would be reimbursable to the extent they were properly allocable to the CPFF contracts; that as a preliminary to reimbursement the plaintiff agree to take all necessary steps to prosecute the claim for refund and proportionately credit the CPFF contracts with any recovery obtained; that since the suit was for the benefit of the Government as well as the plaintiff and since the legal question was close and the amount was large, the Government would reimburse plaintiff for an appropriate part of the legal expenses.

A letter from plaintiff in reply advised that it would take all necessary steps to handle the matter to the best interests of the Government and the plaintiff. Plaintiff also agreed to credit the CPFF contracts with their proper share of the refund.

█ Whether these letters constituted a valid supplementary contract we do not now decide. Suffice it to say that they constituted an agreement as to how the general obligations of the parties under the contract were to apply to the specific facts of this situation. The Government agreed that its duty to reimburse currently obligated it to pay the plaintiff for its expenditure on the tax. The Government also promised the plaintiff that the ratable portion of the legal expenses of the refund suit would be reimbursed by the Government. Plaintiff had wanted some assurances on this score, which is quite understandable since the Government certainly is not obligated to reimburse the plaintiff for every suit, regardless of how improvident, that it may wish to institute.

The plaintiff, on the other hand, acknowledged its duty to minimize the expenses of executing the contracts by making assurances to prosecute the suit diligently and otherwise protect the Government's interest in the matter. The plaintiff further affirmed its evident duty to repay to the Government any reduction in the costs for which it had already been compensated by the Government. The parties do not cite any provision of the contracts that bear on this duty to refund. But such a duty arises in equity and good conscience by natural implication from the principles of a CPFF contract.

The Government reimbursed plaintiff or its prime contractors (who in turn

reimbursed plaintiff) during the period from August 9, 1944, to February 28, 1945, for its outlay on the taxes allocable to the CPFF contracts. The suit was finally won by plaintiff on November 1, 1948, at which time the Supreme Court of California, 32 Cal.2d 872, 198 P.2d 898, awarded plaintiff judgment for the full amount of the taxes plus interest from the date plaintiff had paid them. Plaintiff refunded the Government its allocable share of the taxes but refused to give the Government any part of the interest. The Government demanded all interest accruing on the proportion of the taxes allocable to the CPFF contracts here involved from the time it reimbursed the plaintiff (or the plaintiff's prime contractors had reimbursed it). The Armed Services Board of Contract Appeals sustained plaintiff's contention but the Comptroller General held to the contrary and forced plaintiff to pay over the interest demanded by the Government.

The judgment of the California court had the effect of eliminating at least two items of cost in the performance of the plaintiff's contracts. The first was the elimination of the tax itself. The second was the elimination of the cost of furnishing the money with which the plaintiff had paid the tax. Although the latter cost partook somewhat of the nature of a capital cost, it also can be considered as one of the costs of litigation for which the defendant promised reimbursement. This cost was wiped out by virtue of the fact that the judgment included an amount for interest to compensate by way of damages for the wrongful detention of the money. The second cost was borne by the plaintiff before it was reimbursed and by the Government after reimbursement. To the extent that it has borne this cost by furnishing the money, the Government was in the position of one who has compensated another for the acts of a wrongdoer. A CPFF contract makes the Government liable only for such costs as the contractor incurs and any reduction of a cost after reimbursement entitles the

Government to a refund. In such a situation equity demands, therefore, that when the wrongdoer himself subsequently makes compensation and eliminates the cost, the Government, which paid the cost, is entitled to a refund equivalent to the amount given by the wrongdoer in restitution. When the Government reimbursed plaintiff, it, in effect, succeeded to plaintiff's rights against the State of California and to any incidental rights flowing therefrom.

Nor does this result deprive plaintiff of the advantages which it alleges should accrue to it under the policy of current reimbursement. Plaintiff claims that a benefit of this policy is the consequent saving in capital expenses, either in the form of smaller outlays for interest or in the diminished use of the plaintiff's own capital funds, it would otherwise have to incur. But as already pointed out, there finally was no capital expense in this case after the court had rendered its favorable judgment. To hold in plaintiff's favor here would, consequently, result in the Government's furnishing plaintiff with money which the plaintiff in turn could reinvest solely for its own profit. This could hardly have been the intention of the contract.

But the plaintiff contends that T.D. 5000 requires a different holding. T.D. 5000 provides in part (C.B.1940–2, 407):

"Among the items which shall not be included as a part of the cost of performing a contract or subcontract or considered in determining such cost, are the following: Entertainment expenses; dues and memberships other than of regular trade associations; donations except as otherwise provided above; losses on other contracts; profits or losses from sales or exchanges of capital assets; extraordinary expenses due to strikes, or lockouts; fines and penalties; amortization of unrealized appreciation of values of assets; expenses, maintenance and depreciation of excess facilities (including idle land and building, idle parts of a building, and excess machinery and

equipment) vacated or abandoned, or not adaptable for future use in performing contracts or subcontracts; increases in reserve accounts for contingencies, repairs, compensation insurance (except as above provided with respect to self-insurance) and guarantee work; Federal and State income and excess-profits taxes and surtaxes; cash discount earned up to 1 percent of the amount of the purchase, except that all discounts on subcontracts subject to the Act will be considered; *interest incurred or earned;* bond discount or finance charges; premiums for life insurance on the lives of officers; legal and accounting fees in connection with reorganizations, security issues, capital stock issues, and the prosecution of claims against the United States (including income tax matters); taxes and expenses on issues and transfers of capital stock; losses on investments; bad debts; and expenses of collection and exchange." [Italics supplied.]

Plaintiff contends that the Government was here attempting to recoup a cost under the contract and that interest earned "shall not * * * be considered" in determining the cost of performing the contract. Hence, it is argued, the Government may not demand any of the interest paid on the judgment when it is adjusting the contract.

The plaintiff contends for a mechanical application of the words "shall not * * * be considered" without regard to the historical origin of this provision, its purpose, or its relation to the contract as a whole. T.D. 5000 was originally issued to implement the excess profits provisions of the Vinson-Trammel Parity Act, 48 Stat. 503, as amended, 34 U.S. C.A. §§ 494, 495, 496, 497. Section 26.2 of T.D. 5000 provides in part (C.B.1940–2, 401):

"Sec. 26.2 *Scope of regulations.* —These regulations deal with liability for excess profit on (1) contracts for the construction or manufacture of any complete naval vessel or Army or Navy aircraft, or any portion thereof, entered into after the date of enactment of the Act (June 28, 1940) and before July 1, 1942, and (2) subcontracts made with respect to any such contract."

The scheme of the regulation was to determine profits by subcontracting specified allowable costs from the contract price. "In the case of a contract made on a cost-plus-a-fixed-fee basis the total contract price is the actual, rather than the estimated, cost of performing the contract plus the stipulated fee and any other amounts received by the contracting party for performing such contract." C.B.1940–2, 404. In computing profits it was necessary, therefore, to provide rules for excluding items of income derived from those operations of the contractor which were not connected with the contract. Since the contract price under CPFF contracts would be determined primarily by reference to costs, it was natural to list excluded items of income along with excluded items of cost.

In the present contract T.D. 5000 is to be used solely as the criterion for deciding what costs are reimbursable. Perhaps T.D. 5000, for the purpose of determining excess profits, does list "interest earned" in connection with cost items. This does not mean, however, that T.D. 5000, when used to determine what costs are reimbursable under a CPFF contract, can be stretched to apply to a case which does not involve a cost at all, but an item of revenue.

Even if we consider "interest earned" in its broadest sense, it could only mean interest paid or earned by plaintiff. The Government allowed plaintiff to keep the interest earned by it from the time the tax was paid until the date the defendant reimbursed plaintiff for the amount it had paid out in taxes. After that date it was interest earned not by plaintiff but by the Government funds. In addi-

tion the defendant reimbursed plaintiff for all the expenses of litigation that pertained to the CPFF contracts here involved.[1]

It follows, therefore, that defendant's rights in the interest are not governed by the provisions of T.D. 5000 but rather by the contract as a whole under which, as we have noted, defendant is entitled to judgment.

Defendant's motion for summary judgment is sustained and plaintiff's motion for summary judgment is denied, and the petition is dismissed.

It is so ordered.

LARAMORE, MADDEN, WHITAKER and LITTLETON, JJ., concur.

---

1. The General Accounting Office in passing on the claim made a clear analysis of this phase. We quote from their report:

The Board apparently rejected the Government's claim on the basis of what it considered to be "the injunction of T. D. 5000," as contained in the above-quoted provision thereof. However, insofar as the instant question is concerned, the rights of the parties would appear to be controlled by the special agreement as evidenced by the exchange of correspondence between the Government and the contractor after the question as to the propriety of the additional assessment arose. At that time it was recognized by both the Government and the contractor that the question as to the propriety of the additional assessment presented a disputed legal question, and that substantial doubt existed that the Government was under any legal duty to reimburse the contractor for such payments. However, the correspondence indicates that primarily for the convenience of the contractor the Government agreed promptly to reimburse the contractor for the tax payments provided the contractor, if requested by the Government, would take all steps necessary to prosecute a claim for refund and to *proportionately credit* the cost-plus-a-fixed-fee contracts in question "with any recovery which may be obtained." The contractor by letter of April 21, 1944, agreed "to proportionately credit the CPFF contracts involved with any funds recovered in said litigation." The terms "any recovery" and "any funds" in their normal usage are certainly sufficiently broad to include interest and, hav-

ing in mind the pertinent facts of the matter then existing, no reasonable basis whatever is perceived for construing those terms as having been intended to be exclusive of interest. While it is true that, by further letter of June 2, the contractor stated "If a recovery is made, we agree to credit the CPFF contracts involved with their proper share of the refund," there appears no reason to believe that that statement was intended to restrict in any way the prior similar statements.

Such being the case, it seems obvious that the contractor agreed to credit its Government contracts with any proportionate amounts which might be paid over to it by the State in connection with the transaction. This conclusion finds definite support in the fact that under the terms of the same agreement the Government agreed to bear the litigation expenses applicable to the CPFF contracts thus making it apparent that to the extent the suit for recovery pertained to those contracts it was intended as being for the account of the Government and that the reimbursement by the Government of the tax money created a trust relationship between the parties requiring the contractor to account for the interest allocable to those contracts from and after the date of reimbursement. Of course too there is a complete lack of equity in favor of the contractor in the matter, since obviously there is no moral or equitable reason why the contractor should be permitted to retain the benefit derived from both the State's refund and the payment made to it by the Government.