**JOHNSON CONTROLS WORLD SERVICES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 97–357C.**

United States Court of Federal Claims.

Aug. 10, 1999.

Dale H. Oliver, Los Angeles, CA, for plaintiff. Paul E. Pompeo, Vice President and General Counsel, Johnson Controls World Services, Inc., Cape Canaveral, FL, and Roger N. Boyd, Terry L. Albertson, and Linda S. Bruggeman, Crowell & Moring, Washington, DC, of counsel.

Terry M. Petrie and William W. Steward, Washington, DC, with whom was Acting Assistant Attorney General David W. Ogden, for defendant. Maj. Rebecca E. Pearson, United States Air Force Legal Services, of counsel.

## OPINION

MILLER, Judge.

This matter is before the court after argument on plaintiff's motion for partial summary judgment. At issue is whether plaintiff received income in the form of surplus pension funds incident to its acquisition by a new parent corporation, and whether the Government is entitled to recover earnings income on the pension surplus based on its percentage of participation.

## FACTS

Prior to its pending motion for partial summary judgment, Johnson Controls World Services, Inc. ("plaintiff"), filed two motions to dismiss on December 23, 1998, and January 29, 1999, which generated extensive factual findings. *See Johnson Controls World Servs., Inc. v. United States,* 44 Fed.Cl. 338 (1999); *Johnson Controls World Servs., Inc. v. United States,* 43 Fed.Cl. 589 (1999). Only those facts bearing on the instant motion shall be repeated.

The approximately $56 million in surplus pension funds at issue relate to two in a series of contracts dating back to 1953 initially between the United States Air Force and Pan American World Airways ("Airways") for the performance of maintenance and operation services on the Eastern Test Range (the "ETR") in Cape Canaveral, Florida. Through 1977 Airways charged to the various ETR contracts the costs of its Cooperative Retirement Income Plan ("CRIP"), a defined-benefit pension plan, for pension costs attributable to Airways employees working on the ETR. On September 17, 1977, the Air Force and Airways executed Contract No. F08606–78–C–0004 (the "1978 ETR contract"). The Aerospace Services Division ("ASD") of Airways performed the 1978 ETR contract. In 1979 ASD, including all of its assets associated with the performance of the 1978 ETR contract, was transferred from Airways to Pan American World Services ("PAWS"), a 100%-owned subsidiary of Airways.[1] Airways and PAWS charged approxi-

---

1. After a series of business reorganizations, corporate name changes, and asset transfers, plaintiff effectively succeeded PAWS as the contractor for the 1978 ETR contract. This point was in dispute until the court entered its June 18, 1999 opinion, in which it denied plaintiff's motion to dismiss for lack of subject matter jurisdiction with respect to plaintiff's assertions that (1) plaintiff was not the contractor under the 1978 ETR contract, and (2) neither the Government nor Airways assigned or transferred the 1978

mately $14.9 million in pension costs to the 1978 ETR contract attributable to CRIP and to the Cooperative Retirement Income Plan for the Aerospace Services Division ("CRIP/ASD").[2]

Upon the termination of the 1978 ETR contract, the Air Force and PAWS executed a follow-on Contract No. F08606–84–C–0001 (the "1984 ETR contract"), for the performance of support services on the ETR. In May 1989, Johnson Controls, Inc. ("JCI"), purchased the stock of PAWS from Pan Am Corporation, which was created in September 1984 as a holding company with Airways and PAWS as subsidiaries. The May 1, 1989 stock purchase agreement states that, in consideration for the purchase price, Pan Am agreed "to sell, assign, transfer, convey and deliver" to JCI all issued and outstanding shares of PAWS' capital stock, and also, agreed to cause Airways "to sell, assign, transfer, convey and deliver" to JCI "the Teterboro Assets" owned by Airways. Section 9.3(f) of the agreement also states:

> (f) After the Closing, Seller agrees to indemnify and hold harmless Buyer and the Company and its Subsidiaries, to the extent permitted by applicable law, from and against all Damages asserted against or incurred by Buyer or the Company and its Subsidiaries relating to or arising out of any past or future termination of any pension plan covered by Title IV of ERISA maintained by Seller and/or any of its subsidiaries or affiliates *other than* (a) the Pan Am World Services, Inc. Pension Plan for Government Contract Employees, (b) the Pan Am World Services, Inc. Pension Plan for Commercial Contract Employees and (c) the Pan Am World Services, Inc. Re-

tirement Plan for Employees of TGS Technology, Inc. . . .

(Emphasis added.) In January 1991 PAWS changed its name to Johnson Controls World Services, Inc. PAWS charged to the 1984 ETR contract a total of $2,607,179.69 in pension costs for the plans at issue; thus, the amount of pension costs charged to both the 1978 and 1984 ETR contracts totaled $17,629,858.62.

Between 1991 and 1992, plaintiff received the reversion from the various pension plans in the amount of approximately $49.6 million, and, according to defendant, also received an additional reversion of pension plan assets for a total of $57,583,422.00.[3] Plaintiff filed its complaint in the Court of Federal Claims on May 20, 1997, in response to the Air Force Contracting Officer's March 5, 1997 final decision, demanding, *inter alia*, $54,923,068.00 for plaintiff's alleged failure to refund surplus pension assets pursuant to the 1978 and 1984 ETR contracts. In concert with the contracting officer's decision, Count II of defendant's answer and counterclaim avers that "[p]laintiff is liable to the United States for no less than $54,923,068," as well as for "interest accruing from the date of its noncompliance to the present time." Def's Ans. filed Dec. 9, 1997, ¶ 283. Plaintiff's motion for partial summary judgment seeks to dismantle defendant's counterclaim by asserting that defendant may not recover surplus pension funds in excess of the amount actually charged to the Government by plaintiff or its predecessors-in-interest—$17,629,858.62. Defendant contends that it should recover 95.38% of the pension fund assets, including the earnings thereon, in excess of the amount charged by plaintiff and its predecessors-in-interest, which reflects

ETR contract to PAWS or plaintiff. *See Johnson Controls,* 44 Fed.Cl. 338.

**2.** CRIP/ASD was established by Airways as a separate pension plan for ASD employees, effective January 1, 1979. Like CRIP, CRIP/ASD was a defined-benefit pension plan created for employees participating in CRIP working on government contracts, including all Airways employees working directly on ETR contracts. Airways established CRIP/ASD for the purpose of facilitating separate accounting of pension costs to contracts with the United States from the com-

mercial work of Airways. On October 1, 1985, Airways renamed CRIP/ASD as Pan Am World Services Cooperative Retirement Income Plan ("WS/CRIP") and transferred sponsorship of WS/CRIP to PAWS.

**3.** Plaintiff's reversion of surplus pension fund assets resulted from the termination of the World Services Pension Plan Government ("WS/PPG"). WS/PPG was created on October 1, 1987, by merging WS/CRIP with the government portion of another pre-existing defined-benefit pension plan, the World Services Pension Plan.

the percentage of the Government's contribution to the pension plans at issue.[4]

## DISCUSSION

Summary judgment is appropriate only when the moving party is entitled to judgment as a matter of law and there are no disputes over material facts that may significantly affect the outcome of the suit. *See* RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the non-movant. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. The moving party bears the burden of demonstrating the absence of genuine disputes over material facts. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In its analysis the court may neither make credibility determinations nor weigh evidence and seek to determine the truth of the matter. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.; see H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984) (noting that non-moving party shall "receive the benefit of all applicable presumptions, inferences, and intendments"). Although summary judgment is designed " 'to secure the just, speedy and inexpensive determination of every action,' " *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1); *see Avia Group,* 853 F.2d at 1560, a trial court may deny summary judgment if "there is reason to believe that the better course would be to proceed to a full trial." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

Count II of defendant's counterclaim addresses "the Government's rights to contract price adjustments resulting from a redetermination of pension costs pursuant to ETR Contract Clause J.33, 'Funding of Pension Benefits,' resulting from the closure of the ETR segment." Ans. at 41. Clause J.33 of the 1978 ETR contract, as amended, provides:

a. It is recognized that the contractor's pension plan is not presently fully funded. The unfunded liability is being amortized consistent with the provisions of the Employee Retirement Income Security Act of 1974, applicable Internal Revenue Service Regulation, and the contractor's usual practices for funding such liabilities. The estimated cost of this contract does not include any amount for the unfunded liability for other than the period under contract.

b. If as a result of final close-out of this contract or any follow-on contracts, whichever occurs later, the contractor's segment is closed, the contractor shall submit to the Contracting Officer a statement of this segment's actuarially determined liability and plan assets as computed in accordance with the provisions of [Cost Accounting Standard] 413.

c. Pension fund adjustments will be determined in accordance with [Defense Acquisition Regulation ("DAR") ] Section 15, Part 2. Upon receipt of such statement and supporting documentation, the Contracting Officer, after audit review, shall negotiate with the contractor the amount considered as the fund deficit or excess. The difference between the market value of the assets and the actuarial liability for the segment will be considered as an adjustment to previously determined pension costs.

d. Any adjustment due to a deficit shall be treated as an allowable reimbursable (out-of-target) cost under General Provision 3 and General Provision 4. In such event, an adjustment to the estimated cost of this contract shall be negotiated. That portion of any excess applicable to this contract shall be applied in reduction of any payment to be made by the Government under this contract or will otherwise be credited or paid by such other means as the Contracting Officer may direct.

e. Failure to agree upon the amount of payment or repayment shall be treated as

---

4. Defendant first advanced its theory of recovery based on the percentage of its participation, as opposed to the demand for the entire surplus set forth in the contracting officer's decision, in opposition to plaintiff's motion for partial summary judgment.

a dispute within the meaning of the clause entitled "Disputes" of the General Provisions.

The pertinent DAR provision referenced in ¶ (c) of clause J.33 governing pension fund adjustments is DAR § 15.201–5 (Credits), which, as it applied to the 1978 ETR contract, provided: "The applicable portion of any income, rebate, allowance, and other credit relating to any allowable cost, received by or accruing to the contractor, shall be credited to the Government either as a cost reduction or by cash refund, as appropriate." [5]

### 1. *JCI's acquisition of PAWS*

■ Plaintiff contends that the reversion of the surplus pension assets was not "income" as defined by DAR § 15.201–5 and thus does not constitute a credit that may be recovered by the Government pursuant to clause J.33. Instead, plaintiff argues that when JCI purchased PAWS, JCI paid value to receive an asset, as opposed to income. To the extent that Pan Am received value for the pension plans, plaintiff contends that the receipt of that value constituted a "constructive reversion" of the surplus to Pan Am. Plf's Br. filed Feb. 12, 1999, at 4. Plaintiff points to (1) the proof of claim against Pan Am in United States Bankruptcy Court filed by the United States Air Force asserting its right to approximately $46 million; (2) the Internal Revenue Service (the "IRS") determination that JCI paid the full value of the pension surplus to Pan Am on the date of the acquisition of PAWS, after initially taking the position that the asset reversion constituted taxable income to JCI; and (3) the declaration of John P. Kennedy, Vice President, Secretary and General Counsel of JCI since 1984, in which he states that "[d]uring the negotiations for the purchase of PAWS, JCI considered and paid for PAWS' surplus pension plan as an asset." Decl. of John P. Kennedy, Jan. 27, 1999, ¶ 2.

Defendant disagrees that JCI's acquisition of PAWS extinguished the Government's right to the excess pension funds and that plaintiff did not receive income when it ter-

---

**5.** The court's opinion entered May 4, 1999, *see Johnson Controls*, 43 Fed.Cl. 589, dismissed Count I of defendant's counterclaim, which sought to "determine the Government's rights to its equitable share of the reversionary credits resulting from termination of the WS/PPG pension fund under DAR 15–201.1, 'Composition of Total Cost,' and DAR 15–201.[5], 'Credits.'" Ans. at 39. This left intact Count II of defendant's counterclaim addressing clause J.33, which incorporates by reference the DAR credits provision that is the subject of Count I. Plaintiff's motion for partial summary judgment asserts, *inter alia*, that "the Government is barred from any recovery under Count I of Defendant's Counterclaim or, in the alternative, the Government's maximum recovery is limited to ... the amount of pension costs actually charged to the Government by Plaintiff's predecessor-in-interest." Plf's Br. filed Feb. 12, 1999, at 1. In its June 18, 1999 opinion addressing a distinct, but related, aspect of this case, the court noted that defendant's Count II would likely survive plaintiff's instant motion, which was fully briefed at that time, because the pending motion focuses on the previously dismissed Count I and did not address specifically the Government's rights to the pension fund assets pursuant to clause J.33 that are the subject of Count II. *See Johnson Controls*, 44 Fed.Cl. at 343 n. 8.

At oral argument defendant observed that issues relating to Count II involving clause J.33 were not properly before the court because of the manner in which plaintiff styled its moving brief. *See* Transcript of Proceedings, *Johnson Controls World Servs., Inc. v. United States*, No. 97–357C, at 8–9 (July 9, 1999) ("Tr."). Defendant also noted that consideration of clause J.33 involved certain issues not contemplated by defendant's discussion of the DAR credits provision in its opposition. Defendant's point is not lost upon the court; however, defendant's opposition addresses extensively its rights under the DAR credits provision, which is incorporated by reference into clause J.33, and thus, indirectly, the subject of Count II. In addition, plaintiff's reply filed May 21, 1999, accounts for the impact of the court's May 4, 1999 decision dismissing Count I upon the instant motion: "The effect of the Court's Order is to permit Defendant to pursue its rights under DAR Section 15, Part 2 ... only to the extent that DAR Section 15, Part 2, is incorporated by reference into Clauses J.33 and H.871." Plf's Br. filed May 21, 1999, at 1 n. 1. Although not obligated to respond to plaintiff's assertions that the Government is not entitled to recovery under clause J.33, and that the Government's recovery, if any, under clause J.33 is based on the DAR credits provision, *see id.* at 4, defendant did not avail itself of the opportunity to file a sur-reply. Rather than entertain a fourth round of briefing to accommodate defendant's concerns, the court permitted oral argument on any aspect of clause J.33 related to, but outside of, the DAR credits provision, that defendant did not address in its opposition.

minated the pension plans.[6] According to defendant, JCI paid value only for the capital stock of PAWS and the Teterboro assets. Defendant points out that the Stock Purchase Agreement (the "Agreement") governing the sale of PAWS does not contain a specific reference or indication that JCI paid value for the pension funds. Defendant also challenges plaintiff's "constructive reversion" theory, claiming that the record discloses no evidence indicating that Pan Am claimed an increase in income based on a constructive reversion of pension plan assets pursuant to the sale. To the extent that JCI may have paid value for the pension plans, defendant asserts that JCI was aware that the pension plan assets were encumbered by a government claim; moreover, even if it were uncontroverted that JCI did pay value, the transaction involving JCI and Pan Am would not affect the Government's prior claim to those assets. Regarding the IRS' classification of the pension fund assets for income tax purposes, defendant explains that the IRS' tax treatment of the pension surplus does not affect the contractual obligations bearing upon plaintiff or its predecessor-in-interest.

Defendant aptly observes that the result would be peculiar if the sale of PAWS, a transaction between JCI and Pan Am, affected detrimentally the pre-existing contract rights of the Government to the pension funds controlled by plaintiff and its predecessor-in-interest before and after the transaction. There is an absence of evidence in the record suggesting that JCI paid a certain value for the pension funds separate and distinct from that which it paid for the capital stock of PAWS or the Teterboro assets, or that Pan Am received income from the sale of the pension funds in the form of a constructive reversion. If the value of the pension funds were included in the purchase price, it is not remarked upon in the Agreement or correspondence between JCI and Pan Am.[7] In fact, the record establishes (1) that JCI was advised not to consider the pension funds as an asset incident to the sale of PAWS;[8] (2) that, prior to the acquisition, JCI was aware that the pension funds may be encumbered by a government claim; and (3) that, per the Agreement, Pan Am agreed to indemnify and hold harmless JCI from claims against all pension plans, but excluded specifically indemnification of the plans at issue. Plaintiff advances an untenable position by arguing that JCI, a sophisticated contractor well aware of the pertinent facts, would pay full value for pension plans subject to significant third-party liability without adjusting the purchase price. Even if Mr. Kennedy were correct and the court were not to discount his evidence, the dispositive point is that the Government's right was not extinguished even if JCI paid value.[9]

6. Although contending that the reversion did constitute income to plaintiff, at oral argument defendant asserted that the salient issue did not turn on conceptions of "income," but whether plaintiff was in receipt of excess pension funds falling within the reach of clause J.33 as a result of the reversion. *See* Tr. at 26–28.

7. As discussed *infra* at p. 354, plaintiff asserts that the IRS' classification of the pension fund assets for purposes of the PAWS acquisition indicates that Pan Am received $43,042,089.00 in consideration for such assets.

8. A memorandum dated April 5, 1989, prepared by Hewitt Associates, a pension and insurance consulting firm, for William P. Killian of JCI states:

[PAWS] sponsors three defined benefit pension plans. One plan covers employees working on government projects. This plan provides frozen benefits for most participants and has $36,000,000 of assets in excess of the present value of accrued benefits. In the event of plan termination, it is likely that the government might contend that any excess assets should be returned to the government since the government indirectly funded the plan. Thus, [JCI] should not view the $36,000,000 as an asset.

9. Although plaintiff urges that "JCI's knowledge at the time it acquired PAWS that the Government might assert a claim to the surplus is irrelevant," Plf's Br. filed May 21, 1999, at 7, it would be remarkable if JCI paid value to Pan Am for an encumbered asset subject to a known liability without insisting upon contractual provisions in the Agreement or related correspondence to protect against effectively paying twice for the same pension fund assets. Moreover, plaintiff's suggestion that defendant should pursue its claim against Pan Am in bankruptcy court for the value of the overfunded pension plans undermines the theory that the pension fund assets are not income subject to the DAR credits provision. This argument acknowledges that the pension fund assets are income, or at the very least, value recoverable by the Government and disputes only that the transfer of the assets incident to the acquisition did not constitute income allocated to, or value received from, JCI.

Although plaintiff concedes that "the IRS determination about what constitutes income for tax purposes is not binding on this Court," Plf's Br. filed Feb. 12, 1999, at 6, plaintiff urges that "it is certainly evidence that should be considered by this Court in deciding whether JCI or [plaintiff] received 'income.'" Plf's Br. filed May 21, 1999, at 7. Notwithstanding plaintiff's concession, the IRS' tax treatment of the pension surplus incident to the PAWS acquisition and pension plan reversion has marginal evidentiary value and does not support plaintiff's position. *See Marquardt Co. v. United States,* 822 F.2d 1573, 1579–80 (Fed.Cir.1987) ("As to financial reporting requirements of the SEC and other Government agencies, it is obvious that the requirements of one agency are not necessarily relevant to, much less binding on, another."); *Eaton Corp.,* 93–2 BCA ¶ 25,743, at 128,097, 1993 WL 170134. (explaining that "provisions of the Internal Revenue Code (I.R.C.) are not customarily the standard by which the principles of Government contract accounting are defined"). That plaintiff or JCI may have considered the transfer of the pension funds and the subsequent reversion the mere "realization of the value of the asset," Plf's Br. filed Feb. 12, 1999, at 6, as opposed to "income" subject to clause J.33 and the DAR credits provision incorporated therein does not alter the contractual arrangement existing between the Government and plaintiff or plaintiff's predecessor-in-interest.

Plaintiff presses the court to ignore the binding implications of clause J.33 because PAWS was the subject of a transaction in which it was acquired by a new parent corporation. Throughout the transaction PAWS retained its corporate identity, as well as the assets and liabilities associated with the pension plans. JCI did not pay value or purchase PAWS' assets; JCI paid value only for the shares of PAWS, and "the assets of, and leasehold improvements made by Airways located at Teterboro Airport." After the acquisition PAWS filed an amendment with the State of Florida to change its name to plaintiff—Johnson Controls World Services, Inc.—and then entered into a name-change agreement with the Government. These facts support defendant's contention that "[plaintiff] is merely a continuation of PAWS." Def's Br. filed Apr. 13, 1999, at 19. JCI assumed those assets and liabilities of the pension funds incident to the sale of PAWS as a parent corporation assumes the assets and liabilities of its subsidiary. Contrary to plaintiff's argument, defendant's claim to such assets will not turn on whether plaintiff—or to be accurate, JCI—paid value to Pan Am; rather, it will turn on whether plaintiff or its predecessor-in-interest received a reversion from the pension plans that is subject to the DAR credits provision and clause J.33 over which the Government has a legitimate claim of right.[10]

## 2. *Right to earnings income*

■ Relying primarily on decisions of the Armed Services Board of Contract Appeals, plaintiff alternatively contends that, if the reversion is income within the meaning of the DAR credits provision, defendant's recovery cannot exceed the $17,629,858.62 actually charged to the contracts.[11] Plaintiff discloses

---

10. Regardless of the manner in which the IRS characterized the pension fund assets for the PAWS acquisition, the record indicates that the IRS considered as income the earnings retained by plaintiff exceeding the IRS' assessment of the value of the pension plans at the time of the acquisition. The Department of the Treasury–Internal Revenue Service Form 886A prepared for "Johnson Controls, Inc. & Affiliates" states that "[PAWS] has properly considered the fact its pension plan reversion is taxable income to the extent that it exceeds the $43,042,000 of allocated costs per Valuation Research appraisal." It is approximately this amount that plaintiff claims Pan Am received as a result of the reversion.

11. Plaintiff charged approximately $14.9 million to the 1978 ETR contract and $2,607,179.69 to

the 1984 ETR contract. Contract clause H.871 of the 1984 ETR contract provides:

The proposed change between Defined Benefits Plan and Defined Contribution Plan is subject to subsequent review in accordance with cost principles in effect as of the date of this contract. This review will include consideration of any entitlement for cost or credits to the Government in accordance with the Cost Principles and other terms and conditions of this contract.

Defendant noted that it has not relied upon clause H.871 in support of its counterclaim for recovery against plaintiff. *See* Def's Br. filed Apr. 13, 1999, at 13 n. 9. On this basis plaintiff argued that defendant should be precluded from recovering the amount charged to the 1984 ETR

that "[t]he relevant cases have consistently held that the Government's entitlement to a refund under the credits provision is limited by the amount of cost actually charged to the Government by the contractor." Plf's Br. filed May 21, 1999, at 8. In plaintiff's view, "[t]he purpose of the J.33 clause and of the comparable provisions in [the DAR credits clause] ... is to insure that the contractor will not be reimbursed for costs that it has not actually incurred." *Id.*

It is defendant's position that "once the Government ownership of pension funds is established, the Government's rights to earnings on the Government pension asset follows." Def's Br. filed Apr. 13, 1999, at 22. Defendant disagrees with plaintiff's interpretation of the language of clause J.33 and the DAR credits provision, arguing that the language is "broad enough to include interest and earnings income." *Id.* at 23. Based primarily on *ITT Fed. Support Servs., Inc. v. United States,* 209 Ct.Cl. 157, 531 F.2d 522 (1976), *Northrop Aircraft, Inc. v. United States,* 130 Ct.Cl. 626, 127 F.Supp. 597 (1955), and *Colorado Dental Serv.,* 82–2 BCA ¶ 15,836, 1982 WL 7342, defendant draws two conclusions: First, the Government does not furnish funds to contractors so that they may be reinvested solely for a contractor's own profit; and, second, the attribution of earnings income between the parties to a contract shall be based on percentage of participation in, or contribution to, the source of the earnings.

In *Northrop Aircraft* the contractor, operating under a cost-plus-fixed-fee arrangement with the Federal Government, had paid, under protest, state unemployment insurance taxes from its own funds. The subject contracts established that the Government would reimburse the contractor for the taxes and also pay a portion of the contractor's expenses in any action to recover such

taxes as allegedly overpaid. The Government duly reimbursed plaintiff. After plaintiff prevailed in its suit with the state, in which plaintiff was awarded the full amount of the taxes paid, plus interest from the date on which plaintiff paid the taxes, the Government demanded that plaintiff refund its allocable share of the taxes paid and all interest accruing on the portion of the taxes paid from the time it reimbursed plaintiff. Although refunding the Government its allocable share of taxes, plaintiff refused to refund any part of the interest. The contracts were subject to the following clause: "Among the items which shall not be included as part of the cost of performing a contract or subcontract or considered in determining such cost, are ... *interest incurred or earned.*" *See Northrop Aircraft,* 130 Ct.Cl. at 630–31, 127 F.Supp. at 599–600.

Plaintiff argued that because "interest incurred or earned" was excluded from the allowable costs for which the contractor could charge to the contracts, the Government was precluded from demanding any of the interest paid on the judgment when adjusting the contracts. After noting that cost-plus-fixed-fee contracts make "the Government liable only for such costs as the contractor incurs and any reduction of a cost after reimbursement entitles the Government to a refund," 130 Ct.Cl. at 630, 127 F.Supp. at 599, the Court of Claims reasoned that "[t]o hold in plaintiff's favor here would, consequently, result in the Government's furnishing plaintiff with money which the plaintiff could in turn reinvest solely for its own profit. This could hardly have been the intention of the contract." *Id.* The court also explained that, although certain interest earned was excluded from cost items chargeable to the contracts, the term, in its broadest sense, could only mean interest paid or earned by plain-

---

contract, as well as any earnings therefrom. Although defendant admits that "Contract Clause J.33 ... is the principal basis for the Government's right to recovery under Count II," Def's Br. filed Apr. 13, 1999, at 10 n. 7, defendant's potential for recovery will not be limited to amounts charged to the 1978 ETR contract. First, clause J.33 states expressly that it shall operate in the event of a segment closure due to the "final closeout of [the 1978 ETR contract] or

any follow-on contracts." Second, plaintiff recognizes that "[t]he 1984 ETR Contract is subject to the DAR in effect as of the date of contract award." Plf's Compl. filed Sept. 17, 1997, ¶ 30. Third, that defendant would be precluded from recovering the amounts that plaintiff charged to the 1984 ETR contract, a follow-on contract to the 1978 ETR contract, belies the manner in which clause J.33 was intended to operate.

tiff, and not interest earned by, or paid with, government funds.

In *ITT Federal Support*, the Court of Claims held that the contractor was not entitled to retain post-contract termination earnings and profits on the government-reimbursed employer's share of pension plan contributions, as well as the post- or pre-termination earnings and profits on the employees' share of the contributions. The cost-plus-fixed-fee contract specified that the employer's contributions to the subject pension fund would be kept in a special bank account, and that "[t]itle to the unexpended balance of any funds advanced and of any bank account established ... shall remain in the Government." 209 Ct.Cl. at 164, 531 F.2d at 526. The contract also provided:

All revenues other than the Contractor's fixed fee or fees, if any, accruing to the Contractor in connection with the work under this contract shall be Government property and shall be deposited in a Special Bank Account to be available for payment of allowable cost under this contract. The method by which the [Government] shall recover any surplus monies which may accrue under the [Pension] Plan as a result of employee turnover, contract expiration or termination or for any other reason shall be in accordance with the provisions of a separate agreement between the parties.

209 Ct.Cl. at 165, 531 F.2d at 526. Relying on *Northrop Aircraft*, the court reasoned that any inability of the parties to agree upon a method by which the Government would recover pension plan surplus did not vitiate "the Government's basic contractual right (to the surplus) which underlies [the latter] clause." *ITT Fed. Support*, 209 Ct.Cl. at 165, 531 F.2d at 526. To the extent that plaintiff believed that it deserved the surplus because of its successful management of the funds, plaintiff "could not 'earn' the profits on another's money simply by performing management services; at the most, it could earn compensation for its work." *Id.*

The board reached a similar conclusion in *Colorado Dental.* Plaintiff argued that its receipt of government reimbursement checks for costs incurred in the performance of a cost-plus-fixed-fee contract, as well as the interest earned therefrom, was the contractor's property during the time the funds were deposited in the contractor's checking account. The contract stated that "[t]he Contractor agrees that any refunds, rebates or credits (including any interest thereon) accruing to or received by the Contractor which arise out of the performance of this contract and on account of which the Contractor has received reimbursement shall be paid by the Contractor to the Government." 82–2 BCA ¶ 15,836, at 78,498. In addition, the parties agreed that

[i]n the event that any dispute shall arise under this contract because of any ambiguity, misunderstanding, or eventuality not contemplated by the parties at the time of the execution of this contract, matters of doubt shall be resolved equitably and *with consideration for the fact that this contract is entered into by the Contractor as a public service and not for profit* and that it is the intention of the parties that the Contractor shall not sustain financial loss because of this contract.

*Id.* at 78,492. The contract also incorporated the same DAR provision at issue in the instant matter, section 15.201–5. After determining that the reimbursement checks constituted income within the meaning of the DAR provision, the ASBCA held that the contractor was not entitled to retain the earnings in its account. The board stressed that "[t]he cost principle, DAR 15–201.5 ... provides that the Government may recover either by cost reduction or by cash refund, the applicable portion of any income, rebate, allowance, or other credit relating to an allowable cost, received by or accruing to a contractor." *Id.* at 78,505.

Attempting to distinguish these cases, plaintiff first contends that the nature of the contracts and the factual circumstances markedly differ from this case. Plaintiff points out that *Northrop Aircraft* not only involved a different regulation, but also that "[t]here are no provisions in the ETR contracts or other circumstances indicating that the funds in the pension plan were held 'for the account of the Government.'" Plf's Br. filed May 21, 1999, at 11 (quoting *Northrop*

*Aircraft*, 130 Ct.Cl. at 633 n. 1, 127 F.Supp. at 601 n. 1). Unlike *ITT Federal Support*, the pension plan at issue here "was not funded from a 'special bank account' expressly denominated as 'Government property.'" Plf's Br. filed May 21, 1999, at 12 (quoting *ITT Fed. Support*, 209 Ct.Cl. at 165, 531 F.2d at 526). Second, plaintiff contends that *Northrop Aircraft*, *ITT Federal Support*, and *Colorado Dental* each involved cost-reimbursement contracts and that this contract is a fixed-price incentive contract under which plaintiff assumed a risk that was not a factor in any of these cases. Finally, plaintiff argues that "each of those cost reimbursement contracts included a provision or special agreement that required the contractor to share interest or investment income with the Government." Plf's Br. filed May 21, 1999, at 14.

Plaintiff relies primarily on *NI Industries, Inc.*, 92–1 BCA ¶ 24,631, 1991 WL 276669, *RMK–BRJ*, 74–1 BCA ¶ 10,535, 1974 WL 1710, and *California Institute of Technology*, 69–1 BCA ¶ 7624, 1969 WL 965, *aff'd on reconsideration*, 69–2 BCA ¶ 7892, 1969 WL 972, for the proposition that the Government's right to recovery is limited to that which it has actually paid. In *RMK–BRJ* the ASBCA determined that the contractor, under a cost-plus-fixed-fee contract, was not required to remit to the Government that part of an insurance refund corresponding to the percentage of the premiums contributed by the contractor's employees. The board reasoned:

In our view, the key to the resolution of this dispute lies in the wording of Article 4(f). . . .

"The Contractor agrees that any refunds, rebates, credits, or other amounts (including any interest thereon) accruing to or received by the Contractor or any assignee under this contract shall be paid by the Contractor to the Government, *to the extent that they are properly allocable to costs for which the Contractor has been*

*reimbursed by the Government under this contract . . . .*" (Emphasis supplied.)

We have underlined the language determinative of the appeal. That language is a clear restriction on the right of the Government to refunds, rebates, credits or other amounts accruing to or received by appellant. It is not every refund which a contractor may receive to which the Government is entitled. Before any entitlement arises the Government must have paid the costs to which the refund is applicable.

*RMK–BRJ*, 74–1 BCA ¶ 10,535, at 49,895. In its decision on reconsideration in *California Institute*, the board reached a similar conclusion:

The extent of costs for which Appellant has been reimbursed by the Government are the amounts Appellant contributed out of its own funds to the total premium payments. We found in our decision Appellant did not pay, and the Government did not reimburse Appellant for, that portion of the premium payments which were deduced from [plaintiff's] employees' salaries. Therefore, this portion of the premium payments is not allocable to costs which have been reimbursed by the Government and the Government is not entitled to that portion of the refunds.

69–2 BCA ¶ 7892, at 36,717.[12]

In *NI Industries*, the ASBCA described the Government's underlying grievance as relating to plaintiff's "having kept to itself the entire reversion of residual pension plan assets resulting from termination of [the pension plan]." 92–1 BCA ¶ 24,631, at 122,907–08. Plaintiff argued that it should be permitted to retain the substantial pension surplus reversion because the surplus was generated by the successful investment strategies of plaintiff's retirement committee. Notwithstanding the board's rejection of that argument, it reasoned that "even if we were to infer that the residual assets that reverted to

12. Initially, the Government claimed that it was entitled to a credit for the entire amount of refunded insurance premiums that the contractor had charged as an allowable cost. The contractor's employees had contributed roughly 50% of the premiums out of salary. The ASBCA decided that the Government would be reimbursed only its proportionate share and held that the Government was not entitled to the percentage of premium refunds allocable to premium payments derived from employees' salaries. *See California Inst.*, 69–1 BCA ¶ 7624, at 35,412.

[plaintiff] after the Plan's termination resulted entirely from [plaintiff's] 'successful management of the pension plan,' [plaintiff] could still not retain any earnings that were allocable to pension costs for which [plaintiff] had been reimbursed by the Government." *Id.* at 122,914. Citing to *ITT Federal Support* and *Northrop Aircraft,* the ASBCA explained that the pension plan assets on which the earnings in dispute were realized were contributions to the plan for which plaintiff had been reimbursed by the Government and concluded that permitting plaintiff to retain the earnings would result in the Government furnishing money to plaintiff to reinvest solely for its own profit.

In this case clause J.33 provides that pension fund adjustments shall be determined in accordance with "DAR Section 15, Part 2," and DAR § 15.201–5 states that "[t]he applicable portion of any income, rebate, allowance, and other credit relating to any allowable cost, received by or accruing to the contractor, shall be credited to the Government either as a cost reduction or by cash refund, as appropriate." It is undisputed that the Government contributed 95.38% of the pension funds that generated the interest and earnings that are at issue. Contrary to plaintiff's contention, defendant does not look to the DAR credits provision for indication that "the Government would be entitled to recover the entire amount of the pension surplus, regardless of the amount of pension costs actually paid by the Government in the first place." Plf's Br. filed May 21, 1999, at 17–18. Defendant disclaims that it is entitled to all earnings, but seeks only that percentage based on its level of participation in the pension plans.

Although plaintiff is correct that clause J.33 does not earmark the Government's rights to interest or earnings as did the contract clauses in the cases cited by defendant, plaintiff's cases do not preclude the Government's recovery of interest or earnings on funds that the Government has provided to the contractor in the form of reimbursement, credits, or other income related to allowable contract costs. Moreover, paragraph (d) of clause J.33 states that "[a]ny adjustment [of the pension funds] due to a deficit shall be treated as an allowable reimbursable (out-of-target) cost," and, alternatively, that "any excess applicable to the contract shall be applied in reduction of any payment to be made by the Government under this contract or otherwise be credited or paid by such other means as the Contracting Officer may direct." [13] Given that neither interest nor earnings is referenced specifically, the language "any excess" does not require that interest or earnings on government-funded portions of the plan be unequivocally excluded from any credits potentially owed to the Government. *Cf. NI Indus.,* 92–1 BCA ¶ 24,631, at 122,913 (considering DAR § 15.201–5 to be an "especially sweeping" provision in response to arguments that refunds under clause are due only if "the funds received by a contractor constitute a return to the contractor of a reimbursed cost," or if "funds received by a contractor represent income generated by government funds"). [14]

The foregoing case law is consistent, at least insofar as (1) the Government may not recover from the contractor value, as well as earnings or interest on that value, for which the Government was not initially responsible; and (2) the contractor cannot expect to retain interest or earnings on money furnished to the contractor by the Government in the course of contract performance. Plaintiff has acknowledged that " 'ASPR [DAR] cost

---

13. Although the ETR contracts were fixed-price incentive contracts, paragraph (d) of clause J.33 establishes that pension fund adjustments are allowable, reimbursable out-of-target costs. This renders plaintiff's attempt to distinguish *Northrop Aircraft, ITT Federal Support* and *Colorado Dental,* on the ground that these cases involved cost-reimbursement contracts, less compelling. The ETR contracts did not place the risk associated with correcting any potential deficits in the pension plans upon plaintiff.

14. Plaintiff also points out that clause J.33 states explicitly that the amount of any adjustment should be considered " 'as an adjustment to previously determined pension *costs,*' " and concludes that "[t]he only 'costs' that the parties could adjust under either the 1978 or 1984 ETR contracts are the costs actually *paid* by the Government." Plf's Br. filed May 21, 1999, at 18. Such a mechanical and inflexible application of the clause for the purpose of reaching a restrictive result is inconsistent with the case law interpreting similar provisions.

principles are concerned with assuring that if the Government pays a cost and later that cost is reduced, by whatever means, the Government receives the benefit of that reduction.' " Plf's Br. filed May 21, 1999, at 16 (quoting *RMK–BRJ*, 74–1 BCA at 49,896.) Although the foregoing cases establish that the Government's right to recover credits is not limitless or without certain restriction, the argument that the Government is entitled to recover only "that portion of the pension surplus that was necessary in order to repay the allowable costs previously paid by the Government," Plf's Br. filed May 21, 1999, at 17, ignores the equitable approach to the disbursement of such surpluses.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED** as follows,

1. Plaintiff's motion for partial summary judgment is denied.[15]

2. The parties shall submit a schedule for trial on (1) whether a segment closure took place; (2) whether plaintiff performed an accounting and adjustment consistent with contract language; and (3) should the Government prevail, how the Government's recovery should be measured. The parties shall also advise if any other issues should be tried.

---

15. In its briefs plaintiff contends that "[a]s to the $1,192,254 [demanded in defendant's counterclaim] that the Government may continue to pursue independently under the [DAR] credits provision, the arguments herein apply equally."

Plf's Br. filed May 21, 1999, at 1 n. 1. To the extent that plaintiff's motion seeks judgment on this component of defendant's counterclaim, it is also denied.